**GOLDEN DOOR JEWELRY CREATIONS, INC., Plaintiff, Suisse Gold Assayer & Refinery, Inc., Plaintiff, Leach & Garner Co., Plaintiff/Intervenor, Westway Metals Corp., Plaintiff/Intervenor, Capital Bank, Plaintiff/Intervenor, Stern Metals Corp., Plaintiff/Intervenor,**

v.

**LLOYDS UNDERWRITERS, Defendant, Peter Frederick Wright, Defendant, Sanford Credin, Intervenor Defendant, Lawrence Systems, Inc., Intervenor Defendant.**

**LEACH & GARNER CO., Plaintiff,**

v.

**Peter Frederick WRIGHT, Defendant.**

Nos. 83–1409–CIV, 84–0354–CIV.

United States District Court,
S.D. Florida.

Oct. 11, 1990.

1530

Herbert P. Polk, Whitman & Ransom, New York City, for Lloyds Underwriters.

Paul H. Bass, Krongold & Bass, Coral Gables, Fla., David Russell, Walters Costanzo Miller & Russell, Miami, Fla., for Golden Door.

Joseph L. Rebak, Tew Garcia–Pedrosa & Borgognoni, Miami, Fla., Irving Slifkin, Englewood Cliffs, N.J., for Westway Metals.

John H. Phelan, Kimbrell & Hamann, Christopher Barkas, Wicker Smith Blomqvist Tutan O'Hara McCoy Graham & Lane, Miami, Fla., for Lawrence Systems.

Hilarie Bass, Greenberg Traurig Askew Hoffman Lipoff Rosen & Quentel, Miami, Fla., for Capital Bank.

Dyanne E. Feinberg, Gilbride Heller & Brown, Miami, Fla., for Stern Metals, Inc.

Ronald B. Hamilton, Cozen & O'Connor, Philadelphia, Pa., for Leach & Garner Co.

ORDER GRANTING PLAINTIFFS/IN-TERVENORS LEACH & GARNER COMPANY AND WESTWAY METALS CORPORATIONS' MOTIONS FOR SUMMARY JUDGMENT AND ADDRESSING DEFENDANT LLOYDS UNDERWRITERS' MOTIONS FOR SUMMARY JUDGMENT AND/OR OTHER RELIEF REQUESTED

ARONOVITZ, District Judge.

THIS CAUSE came before the Court upon nine motions for summary judgment now fully briefed and at issue in this Cause, and upon several motions relating to issues collateral thereto. The filings addressed by this Order include the following:

   a. Defendant Lloyds' Motion #1 for Partial Summary Judgment with Respect to the Property "in Custody of Lawrence System," file dated August 15, 1985;

   b. Defendant Lloyds' Motion for Summary Judgment II as against Plaintiffs Golden Door and Suisse Gold, file dated August 15, 1985;

   c. Defendant Lloyds' Motion to Renew Motion for Summary Judgment, file dated October 11, 1988;

   d. Defendant Lloyds' Motion for Reconsideration and Renewal of Motion to Dismiss the Complaint and for Summary Judgment and Alternative Relief, file dated November 3, 1988;

   e. Defendant Lloyds' Motion for Summary Judgment Dismissing the Complaint Herein Based on Collateral Estoppel, file dated May 26, 1989;

   f. Defendant Lloyds' Supplemental Motion for Summary Judgment, file dated September 22, 1989;

   g. Defendant Lloyds' Motion for Summary Judgment Dismissing Complaints of Intervenors and Plaintiff, file dated November 6, 1989;

   h. Motion of Intervenor Westway Metals Corporation for Summary Judgment Against Defendants, file dated January 22, 1990;

   i. Motion of Intervenor Leach & Garner Company for Summary Judgment Against Defendants Pursuant to Federal Rule of Civil Procedure 56, file dated January 22, 1990;

   j. Intervenor Leach & Garner's Motion to Strike Amended Statements Pursuant to Rule 10(J)(2) Filed by Defendants, file dated February 6, 1990;

   k. Intervenor Leach & Garner's Motion to Strike the Eight Pending Motions of Defendants for Summary Judgment, file dated February 8, 1990.

THE COURT has considered each of said motions, together with all memoranda of law in support thereof, responses and replies thereto, and each deposition, affidavit, attachment and supplemental authority cited in support by the parties. The Court, over the course of two days, heard oral argument on the issues, and has conducted its own research. The case file now consists of some 19 volumes, housing over 700 separate docket entries. Some of the above-pending motions have been held in abeyance over several years to allow the completion of discovery, and the advent of certain criminal proceedings now completed. It is now

ORDERED AND ADJUDGED that the motions for summary judgment filed by plaintiff/intervenors WESTWAY METALS CORPORATION and LEACH & GARNER COMPANY be, and the same are each hereby GRANTED. The Court concludes, as a matter of law, that the intervenors are entitled to the relief sought for the reasons set forth below, and no genuine issues of material fact remain in dispute which might prohibit entry of judgments. With respect to the seven motions for summary judgment submitted by defendants, all of said motions are hereby DENIED, except as set forth below, insofar as genuine issues of material fact remain in dispute thereby barring entry of judgment under Fed.R.Civ.P. 56 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nonetheless, entry of summary judgments hereafter for intervenors is fully dispositive with regard to the rights asserted by and against defendants Lloyds and Wright.

**1532**

## BACKGROUND

This action was originally brought by two Florida corporations, GOLDEN DOOR JEWELRY CREATIONS, INC. and SUISSE GOLD ASSAYER & REFINERY, INC. ("Golden Door" and "Suisse Gold," respectively), against their insurer LLOYDS UNDERWRITERS and underwriter PETER FREDERICK WRIGHT (collectively referred to as "Lloyds" throughout). While plaintiff corporations did business at the same location in North Miami, Florida, and shared common officers and ownership, each were maintained as distinct business entities. Suisse Gold's business consisted principally of purchasing scrap gold, refining it, and selling it to Golden Door and like businesses engaged in the manufacture and retail sale of gold and objects made from precious metals.

In March, 1982, plaintiff corporations purchased a series of insurance policies [1] from underwriter Wright, as issued by defendant Lloyds. The policies, known as "Jewellers' Block Policies," were to provide each respective plaintiff with up to $6 million worth of protection for its jewelry stock, or for jewelry delivered or otherwise entrusted to the assured by dealers or non-dealers as against a number of risks faced by goods of such type, including theft.

On February 10, 1983, plaintiff corporations suffered at the hands of parties then unknown a robbery, losing a combined total in excess of $9 million in assorted items in their possession or in the possession of their field warehouser, Lawrence Systems, Inc. Defendant Lloyds refused payment on the policies, and this suit—a once seemingly innocuous breach of contract action—resulted.

The plaintiff corporations' Amended Complaint requests payment on the underlying series of policies, and seeks damages against Wright for his alleged breach of his "implied duty as an insurer to deal fairly and in good faith with the Plaintiffs." Amended Complaint at 2 (DE 23). Among other defenses, Lloyds asserts, in its Answer to the amended complaint (DE 35),

that upon information and belief, the robbery had resulted from an act of dishonest character on the part of the assureds or his or their employees, and coverage was therefore excepted under Paragraph 5(A) of the policies at issue. Paragraph 5(A) provides an exception from coverage for "[l]oss, damage, or expense caused by or resulting from sabotage theft, conversion, or other act or omission of a dishonest character (1) on the part of the Assured or his or their employees, or (2) on the part of any person to whom the property hereby insured may be delivered or entrusted...." Policy para. 5(A) (DE 1, attachment). Lloyds suggests that this exception effectively precludes plaintiff corporations from recovering on the policy, and also precludes recovery by those individuals who had placed jewelry on consignment with plaintiff corporations and/or its warehouser. Lloyds additionally argues that plaintiff corporations are not entitled to recover on the policies by virtue of their breach of Insuring Condition 8(A), which requires the Assureds to "maintain a detailed and itemized inventory of their property ... in such a manner that the exact amount of the loss can be accurately determined therefrom by the Underwriters," and for their failure to "furnish a complete list of the lost or damaged property stating the market value and cost of each article and amount claimed thereon" as required by Insuring Condition 13. *See* Policy para. 8(A), 13 (DE 1, attachment).

Along with the plaintiff corporations, the policies name as assured SHAUL CREDINCIOSU, a/k/a Sanford Redin, a/k/a "Sandy" Credin ("Credin"), who is President and owner of at least 50% of the stock in plaintiff corporations. Credin's wife, Jeni, is alleged to be the owner of the remaining 50%. On January 12, 1988, Credin was indicted on charges of, *inter alia,* insurance fraud, theft and embezzlement. He fled to Germany, where he was apprehended and extradited. Credin was returned to the Southern District of Florida, where he later appeared before The Honor-

---

**1.** At issue are three of Lloyds, *"Jeweller's Block Policies."* The primary policy, numbered 552/243017600, is supported by two excess policies, numbered 552/243017700 and 552/243030200. Except where otherwise noted, quotations, citations and references are made to the provisions of the primary policy.

able James W. Kehoe and pleaded guilty to charges of mail and wire fraud with regard to the gold insured by Lloyds and as charged in Count VI of the criminal indictment, seemingly giving credence to Lloyds defense of exception under the policies.

Intervenor LEACH & GARNER CO. ("Leach & Garner") is a Massachusetts corporation engaged in the business of the fabrication, sale and distribution of fine gold and other precious metals. Leach & Garner asserts that as consignor of gold to Golden Door, and under the terms of its consignment agreement with Golden Door, it is entitled to status as beneficiary and insured under that plaintiff's insurance policies. Accordingly, Leach & Garner brought suit against Wright, case number 84–0354–CIV–HOEVELER, seeking recovery from Lloyds and from Wright for over $1 million worth of its own goods, and an amount in excess of $1.5 million for goods used to secure additional debts owed it by Golden Door. Leach & Garner also intervened as a plaintiff in the original suit brought by plaintiff corporations, case number 83–1409–CIV–HASTINGS, asserting identical grounds for relief. These cases were subsequently consolidated by Judge Hastings.

While Leach & Garner aspire to status as co-insured or third party beneficiary, it is not so named under the policies at issue. Enter defendant LAWRENCE SYSTEMS, INC. ("Lawrence"). Lawrence, a field warehousing company, had been retained by plaintiff Golden Door as a bailee/warehouser, and is named as loss payee under the policies. Lawrence maintained a field warehousing operation on the premises of Golden Door, pursuant to a supplier field warehousing agreement. Intervenor Leach & Garner claims the appearance of Lawrence as loss payee is a mistake since Lawrence acted only as warehouser and did not actually own any of the goods in question, and asks that the policies be reformed to substitute it, Leach & Garner, in place of Lawrence.

Finding itself in a position somewhat similar to that of Leach & Garner, intervenor WESTWAY METALS, INC. ("Westway") intervened as plaintiff on December 11, 1984 (DE 136). Westway had con-

signed gold and jewelry to plaintiff corporation Suisse Gold, and claims to have lost almost $5 million of it in the theft. Like Leach & Garner, Westway claims a security interest in personal property of the plaintiff corporation, and claims that under the terms of *its* consignment agreement, it too is entitled to status as beneficiary and/or co-insured under plaintiffs' insurance policies. It therefore seeks the full amount of its interest from Lloyds, or alternatively, from Suisse Gold. Unlike Leach & Garner, however, Westway was specifically designated as loss payee under an endorsement to the policies. Westway also sues Lawrence for breach of the consignment agreement, and for breach of its duty of care with regard to the merchandise at issue.

CAPITAL BANK intervened as well, filing a complaint against Lloyds and a cross-claim complaint against Suisse Gold. Capital Bank alleges it obtained and perfected a security interest in a promissory note it had acquired from Suisse Gold in the amount of $750,000. Provisions of the assignment agreement maintained that the underlying goods would be covered by insurance, and that proceeds from the insurance would be made payable to Capital Bank in the event of loss. The bank initiated an action in the Eleventh Judicial Circuit in and for Dade County, Florida, and on November 2, 1984, obtained judgment in the amount of $324,090.77. It now seeks recovery from Lloyds to the extent of its interest, and, *inter alia,* crossclaims against Suisse Gold for the same.

Similarly, STERN METALS intervened against Lloyds and Wright, and also filed a crossclaim against Golden Door. Stern had obtained a judgment against Sandy Credin as Trustee of Golden Door Jewelry Creations, Inc., in the amount of $1,844,270.09. Stern now alleges that to the extent that Lloyds is held liable to Golden Door, it is entitled to directly recover due to a lien on various Golden Door personal property up to the amount of its final judgment. Neither Capital Bank nor Stern Metals, however, are able to claim a direct security interest against the gold owned by Leach & Garner or Westway, rather they seek payment of unrelated obligations through the insurance proceeds recovered by plaintiff corporations Golden Door and Suisse Gold.

## PROCEDURAL HISTORY

The earlier of these consolidated actions, formerly case number 83–1409–CIV–HASTINGS, originated in state circuit court on May 5, 1983. In a one and one-half page complaint, plaintiffs Golden Door and Suisse Gold asserted their claims against Lloyds under the insurance policies in the respective amounts of $4,271,547.45 and $5,594,770.67, together with interest from the date of the robbery. The case was removed to this Court in June, 1983, and was assigned to The Honorable Alcee Hastings. This case, and the later-filed case number 84–0354–CIV–HOEVELER were consolidated by Judge Hastings in an Order issued September 14, 1984 (DE 92). Discovery proceeded and two years passed before defendants filed their first motions for summary judgment.

On July 9, 1986 (DE 249), Judge Hastings ordered that rulings on these initial motions for summary judgment be deferred until the completion of discovery. This Court now faces a backlog of motions, all of which contain a full complement of attachments, and all of which have warranted a flurry of responses, replies, affidavits and 10.J.2 statements [2] from the leading players, Lloyds, Leach & Garner and Westway.

## PENDING MOTIONS

To date, nine potentially case-dispositive motions remain pending with the Court. These include seven motions for summary judgment filed by defendants Lloyds and Wright, *see supra* p. 2 (a–g), and one each filed by intervenors Westway and Leach & Garner. *Id.* (h, i).

### Lloyds' Motions for Summary Judgment

With regard to the motions for summary judgment submitted by defendants Lloyds and Wright, and after exacting consideration of the grounds set forth therein, the Court now denies the above motions (a)[3], (c)[4], (d)[5], (e)[6], (f)[7] and (g)[8], and grants

---

**2.** The Local Rules for the Southern District of Florida require, in conjunction with a motion for summary judgment, the filing of "a concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." S.D.Fla.Gen.R. 10.J.2.

**3.** *Defendant Lloyds' Motion # 1 for Partial Summary Judgment with Respect to the Property "in Custody of Lawrence System"* (DE 191). There remain several issues of material fact which preclude this Court's entry of summary judgment in favor of movant Lloyds against either of the intervenors Leach & Garner or Westway regarding property purportedly in the possession of Lawrence. The most salient questions of fact remaining concern whether warehouseman Lawrence retained independent control of the goods once delivered, and if so, whether the delivery was made to Lawrence, or to Suisse Gold and/or Westway. *See, e.g., Jimani Corp. v. SLT Warehouse Co.,* 409 So.2d 496, 499–500 (Fla. 1st DCA 1982) ("It is not unusual for an employee of the seller to be loaned to, and employed by, the warehouseman to take charge of the goods. *Minimum requirements must be met, however, so that the warehouseman has control independently of the seller and is, therefore, legally in possession of the goods."* (footnote omitted) (emphasis added)).

**4.** *Defendant Lloyds' Motion to Renew Motion for Summary Judgment* (DE 367, 368). On July 9, 1986 (DE 249), Judge Hastings ordered that rulings on then-pending motions for summary judgment be deferred until the completion of discovery. In this, Lloyds' motion to renew the above motions for summary judgment, defendants requests that the Court address the motions, as it suggests that the previous two years of discovery have failed to uncover any new evidence pertinent to the arguments contained therein. This motion is now rendered moot, as the relief requested therein is effectively being addressed by this Order.

**5.** *Defendant Lloyds' Motion for Reconsideration and Renewal of Motion to Dismiss the Complaint and for Summary Judgment and Alternative Relief* (DE 370–372). In this motion, Lloyds requests reconsideration of its motion to dismiss, renews its motion for summary judgment, and alternatively requests the dismissal of the Complaint pursuant to Rule 37(d) for Plaintiff Credin's failure to appear for deposition. Given that Sandy Credin's deposition has long since been completed, and that the remainder of the arguments set forth in this motion, the 20–page memorandum of law, 12–page affidavit, and multi-paged 10.J.2 statement, as well as the response and reply thereto are either meritless or repetitive of arguments already before the Court, Lloyds' motion is denied.

**6.** *Defendant Lloyds' Motion for Summary Judgment Dismissing the Complaint Herein Based on Collateral Estoppel* (DE 398–401). Here defendants demand entry of summary judgment as they argue that Credin's plea of guilty in the criminal case before Judge Kehoe is preclusive of whether he had committed the fraud in ques-

**7–8.** See notes 7–8 on page 1535.

motion (b) [9] in favor of Lloyds only as to its affirmative defenses numbered IV and VII, and only to the extent that such a ruling precludes recovery under the policies by plaintiffs Credin, Golden Door and/or Suisse Gold. Although the Court first addresses Lloyds' motions for partial summary judgment as to its affirmative defenses numbers IV and VII, this ruling does not affect the dispositive rulings entered in favor of plaintiff intervenors Leach & Garner and Westway.

### Lloyds' Affirmative Defenses

■ In its "Motion # 2 for Partial Summary Judgment" (DE 192), defendants Lloyds and Wright request partial summary judgment on their affirmative defenses numbers IV and VII, which seek to preclude plaintiff corporations Golden Door and Suisse Gold from recovering under the policies for violations of various insuring conditions set forth therein. Lloyds alleges that the plaintiff corporations failed to maintain an itemized inventory as required by the terms of the policies issued, and failed to submit a complete listing of said property with its claims. The pivotal provisions of the policy require that the assureds "maintain a detailed and itemized inventory of [his or] their property ... in such manner that the exact amount of loss can be accurately determined therefrom by the Underwriters," Policy para. 8(A) (DE 1, attachment), and that the assureds "... furnish a complete list of the lost or damaged property stating the market value and

tion, hence disqualifying Credin and plaintiff corporations from recovering under the policy. The Court finds that several material issues of fact remain which preclude entry of summary judgment on this motion. First, there is the question of whether plaintiff corporations possess an identity separate and distinct from Sandy Credin, or whether they are merely his "alter ego." Further, the matter of whether the criminal acts of Sandy Credin should be imputed to plaintiff corporations hinges upon the factual (and by all accounts, material) issue of whether said acts were committed for the benefit of plaintiff corporations, or for the benefit of Credin alone. As observed by the intervenors, these questions are more appropriately reserved for determination by a jury. *See, e.g., Fisher v. First Stamford Bank & Trust Co.,* 751 F.2d 519, 522 (2d Cir.1984); *Hooper–Holmes Bureau, Inc. v. Bunn,* 161 F.2d 102, 105 (5th Cir.1947).

The Court further finds, following *Restatement (Second) of Judgments* § 28(5)(a), that the use of issue preclusion or collateral estoppel is inappropriate here. While Credin's conviction of fraud might well be admissible at subsequent proceedings, *Perry v. Capitol Air, Inc.,* 649 F.Supp. 1260 (D.Puerto Rico 1986), the plea should not be used to create potential prejudice to the intervenors, who were not parties to that action and were not in a position to protect their respective interests.

7. *Defendant Lloyds' Supplemental Motion for Summary Judgment* (DE 444). The Court need not reach the issue of whether Credin's plea of guilty conclusively establishes the applicability of exclusionary provision 5(A) of the policies. Plaintiffs Credin, Golden Door and Suisse Gold have effectively been precluded from recovering on the policy by virtue of the Court's ruling on Lloyds' affirmative defenses IV and VII.

Even were this not the case, the Court remains reluctant to hold, as a matter of law, that a guilty plea in a criminal case should be dispositive of pivotal issues in factually related civil proceedings. *See, e.g., Garden State Fire & Casualty Co. v. Keefe,* 172 N.J.Super. 53, 57, 410 A.2d 718, 721 (1980) (court refused to apply collateral estoppel in civil proceedings following defendant's plea of guilty to underlying criminal charges, noting that "a plea entry proceeding is not and does not purport to constitute a full and fair litigation of the issues. To the contrary, it represents a defendant's option to forego such litigation and usually for reasons having little or nothing to do with the nature of the issues themselves. Obviously, it would be unfair for the victim of defendant's conduct to be precluded from seeking civil recovery, by defendant's entirely unilateral and self-interested decision to waive trial of the criminal charge.").

8. *Defendant Lloyds' Motion for Summary Judgment Dismissing Complaints of Intervenors and Plaintiff* (DE 466). Aside from the heated legal dispute as to whether the jeweler's block policy at issue is a distinct form of insurance containing elements of both property and liability coverage, several material and triable issues of fact remain to preclude the entry of summary judgment in favor of Defendant Lloyds. There remains the recurring question of whether Credin's actions may be imputed to plaintiff corporations. Also integrally tied to the question of the respective intervenors' rights is the matter of whether Mrs. Sandy Credin might be entitled to claim status as an innocent co-insured under the policies.

9. *Defendant Lloyds' Motion for Summary Judgment II as against Plaintiffs Golden Door and Suisse Gold* (DE 192). Here Lloyds seeks partial summary judgment on its affirmative defenses numbers IV and VII. This motion is discussed in detail in the section to follow.

cost of each article and amount claimed thereon." *Id.* para. 13.

As against Golden Door, defendants allege that while an inventory was taken as of July 1, 1982, it had not been maintained between that date and February 10, 1983. As against Suisse Gold, defendants contend that no inventory of any kind had been taken in the 30 months of that entity's existence prior to the robbery. Lloyds backs its assertions with affidavits and supporting documents. *See* Affidavit of Herbert P. Polk and attachments (DE 192 & exhibits 1–8).

Plaintiff Credin and plaintiff corporations, having remained dormant in this litigation roughly since the time defendants filed their first motions for summary judgment, have failed to provide a response to the assertions contained in defendants' motion for partial summary judgment. Accordingly, those plaintiffs have not dispelled the burden placed upon them by *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and defendants Lloyds and Wright are therefore entitled to summary judgment in their favor on their affirmative defenses IV and VI. Credin, Golden Door and/or Suisse Gold are therefore precluded from recovering on the policy. This limited ruling shall not be interpreted, however, to impact upon the opportunities for recovery provided the intervenors, whose respective rights are discussed below.

*Intervenors' Motions for Summary Judgment*

Despite repeated requests, this Court remains reluctant, without aid of a jury, to make the leap over the factual chasms that might entitle defendants to summary judgment in their favor as against intervenors Leach & Garner and Westway. Such is not the case with those intervenors' requests for entry of summary judgment in their favor, as such would only require ratification of intervenors' interpretation of the applicable law with regard to the status of the respective intervenors under the policies at issue. As intervenors' motions are virtually identical in substance, and their respective positions virtually identical with regard to their working relationships with each respective plaintiff corporation, intervenors' motions [10] will be addressed simultaneously.

## DISCUSSION

Intervenors Leach & Garner and Westway have argued (1) that the policies at issue include elements of liability coverage as well as elements of property coverage; (2) that under the liability aspects of the policies Leach & Garner and Westway, as consignors, owners and secured creditors of much of the merchandise taken from the premises of the assureds, may exercise a direct right of recovery against the insurer as third party beneficiaries or as unnamed assureds under the policies; and further, that (3) those intervenors, as such, are not subject to defenses which may serve to preclude recovery by the named assureds. Intervenor Leach & Garner additionally (and intervenor Westway, implicitly [11]) argues that even if the Court is not in agreement with this line of reasoning, it should nonetheless invoke its equitable powers to reform the underlying policy to reflect the true relationship between the parties.

The Court now concludes, as a matter of law, that a jeweler's block policy does not simply represent a combination of a number of existing types of insurance, but is rather in the nature of a new type of insurance; an all risk policy containing elements of both property and liability coverage. And since the jeweler's block policy provides coverage to protect the assured from legal liability, a substantial interest is

---

10. The motions addressed in this section are the Motion of Leach & Garner Company for Summary Judgment Against Defendants Pursuant to Federal Rule of Civil Procedure 56 (DE 551), and the Motion of Westway Metals Corporation for Summary Judgment Against Defendants (DE 554).

11. While Leach & Garner's demand for reformation of the underlying policies is contained in its operative Complaint (DE 66), Westway requests, in its motion of February 21, 1990 (DE 632) that it be permitted to amend its Complaint to include demands for reformation of the underlying policies. That motion has not been addressed by the Court, and this Order shall not be construed as constituting a ruling thereupon.

thereby created in the consignor of goods to the assured. The Court finds therefore, again, as a matter of law and by the nature of the policy and practice common to the industry, that consignors of merchandise to named assureds stand as the equivalent of third party beneficiaries and/or named co-insureds under such policies, and that the policies should permit a direct right of recovery against the insurer by those consignors. The Court further concludes, by virtue of the nature of the policy involved, that plaintiff/intervenors Westway and Leach & Garner may claim against the policy issued by Lloyds without regard to the alleged fraudulent acts of named assured Sandy Credin, and plaintiff intervenors are thus entitled to judgment in the full amount claimed as a matter of law. These conclusions will be addressed individually.

*Property and Liability Coverage*

■ As a preliminary matter, the question of whether a jeweler's block policy is a policy exclusively designed to protect only property interests or whether it includes additional elements of liability coverage cannot be answered solely by analogy to individual policies providing the same sorts of protections as those provided therein. If one proposition stands clear above others, it is that the jeweler's block policy

> [is] not a combination of various risks united in one policy for convenience, but [is], in reality, a new and totally different kind of insurance which was not authorized prior to the passage of permissive legislation. Indeed, if this type of insurance were considered merely a combination of risks, there would have been no need for [permissive legislation].

*Woods Patchogue Corp. v. Franklin Nat'l Ins. Co.,* 5 N.Y.2d 479, 186 N.Y.S.2d 42, 45, 158 N.E.2d 710, 712 (1959).

In *Woods,* the New York Court of Appeals rejected defendants' contention that the insured under a jeweler's block policy was subject to the same sorts of warranties which must, by New York law, accompany standard fire insurance policies issued within the state. Instead, the court found the jeweler's block policy more akin to marine insurance, "meaning insurance against any and all kinds of loss or damage to ...

[*inter alia*] (c) Precious stones, jewels, jewelry, gold, silver and other precious metals, whether used in business or trade or otherwise and whether the same be in course of transportation or otherwise." *Id.* 186 N.Y.S.2d at 44, 158 N.E.2d at 712 (quoting New York Insurance Law § 46, subd. 20). This interpretation, construing the jeweler's block policy to be in the nature of an all risk marine policy, comports with the "inception and history" of that particular type of insurance:

> The idea was conceived by a Lloyds of London underwriter at the turn of the century. Many American jewelers availed themselves of this policy since it provided them with the only adequate coverage for the various risks inherent in their businesses. The inadequacy of coverage offered to jewelers by domestic insurance companies was highlighted by the Superintendent of Insurance in urging the passing of legislation permitting jewelers' block insurance. 'Under the American System, a jeweler insuring property in specific locations must get a standard form of policy against fire from a fire company, and also, a second policy from a fire company which will include those coverages not contained in the standard form. He must obtain a policy from a casualty company, also a policy from a surety company, and a policy from a marine company if the property is to be transported, and then he is not covered as fully as he would be under the Lloyds policy.' 65th Annual Report of the Superintendent of Insurance, N.Y. Legis.Doc., 1924, No. 21, p. 15.

*Woods,* 5 N.Y.S.2d at 45, 158 N.E.2d at 712.

To date, it remains the case that an incorporated foreign insurance company can do business within a state only by that state's consent, and the scope of the business which it may conduct is dependent upon the laws of that state. *2A Couch on Insurance 2d* § 21:43 (1984 & Supp.1989). "Thus a foreign insurer cannot write 'all risk' inland marine insurance when the law of the state in question does not permit it to do so." *Id.*

It is therefore instructive to take particular note of the permissive legislation passed by the State of Florida, which clearly classifies the jeweler's block policy not as a property policy per se, but rather as a type of inland marine, all risk insurance. Section 624.607, Florida Statutes (1989) provides general definitions for marine insurance and inland marine insurance, and provides that the latter "is as established by general custom of the insurance business and promulgated by rule of the department." Fla.Stat. § 624.607(3) (1989). Pertinent portions of the applicable department rules are reproduced below:

### CHAPTER 4–48

### INLAND MARINE INSURANCE DEFINED

**4–48.003  Conditions under Which Marine and/or Transportation Policies May Cover.**

.        .        .        .        .

(6) Commercial Property Floater Risks. Commercial property floater risks covering property pertaining to a business, profession, or occupation include:

.        .        .        .        .

(r) policies covering personal property which, when sold to the ultimate purchaser, may be covered specifically, by the owner, under Inland Marine Policies including:

.        .        .        .        .

6.  *Jewlers' Block Policies.*

Fla.Admin.Code R. 4–48.003 (1989) (emphasis added).

Intervenor Westway has suggested that, particularly in Florida, a jeweler's block policy should be construed in a manner similar to a builder's risk policy, which has been clearly held to include liability as well as property coverage. *Dyson & Co. v. Flood Engineers, Architects, Planners, Inc.*, 523 So.2d 756 (Fla. 1st DCA 1988). In *Dyson*, Florida's First District Court of Appeal followed the majority view that the phrase "as their interests may appear," as it was used in a builder's risk policy, was not indicative of a property policy—a position held by the minority—but rather that the policy "include[d] liability interests as well as property interests." *Id.* at 759. The court thereby upheld summary judgment in favor of an architectural firm which, though unnamed in the policy, was found to hold "a substantial interest in being held free from any liability arising out of its participation in the [construction] project." *Id. See also American Ins. Co. v. L.H. Sowles Co.*, 628 F.2d 967 (6th Cir. 1980) (builder's risk policy construed in favor of insured, to provide property coverage for insured's own property, as well as liability coverage for loss of all property for which any insured subcontractor might be liable).

Intervenors' interpretation of the type of all risk coverage afforded by the jeweler's block policy appears to be consistent with that of the Supreme Court of Massachusetts, which conducted a predominantly historical analysis of the genesis and evolution of the pertinent authorizing legislation. In *Insurance Co. of North America v. Commissioner of Insurance*, 334 Mass. 108, 134 N.E.2d 423 (1956), the Massachusetts high court noted that in 1872, authorizing legislation allowed incorporation

'for the purpose of transacting the business of insurance ... against loss or damage by fire, by lightning, by tempest, or by the perils of the sea, and other perils usually insured against by marine insurance companies, including risks of inland navigation and transportation ...'

*Id.* at 427. The legislation evolved, and by 1921, a second clause was added

'[t]o insure ... against the perils of the sea and other perils usually insured against by marine insurance; risks of inland navigation and transportation; also, in connection with marine or inland marine or transportation insurance on property, to insure against any risk whether to person or to property, including liability for loss or damage to either, arising out of the construction, repair, operation, maintenance or use of the subject matter of such primary insurance ...,'

*Id.* In 1927, the element of transportation was deemphasized, and to the statute was added an additional subsection entitled "An

Act providing for jewelers' block insurance." *Id.* That section was further expanded in 1931, and was retitled "An Act permitting certain insurance companies to insure certain personal property against all risks or hazards." *Id.*

Thus, a jeweler's block policy does not simply represent a combination of a number of existing types of insurance, but is rather a new type of insurance born out of more traditional inland marine policies. The structure of Florida's permissive legislation comports with this historical analysis. It should therefore be beyond question that, in Florida, an insurer is *at least permitted* to provide a combination of property and liability coverage in the form of a jeweler's block policy. For, as the court noted in *Woods*, if a jeweler's block policy were to provide only a combination of various property protections of several preexisting varieties, permissive legislation would not have been necessary.

▮ The Court now turns to the crucial question of whether the language of the particular policy at issue here indeed provides such a combination of coverage. At oral argument, counsel for intervenor Leach & Garner noted that the language of the policy reflects elements of liability as well as property coverage:

> Now, this policy has all the indicia of a liability policy. It gives the insurance company underwriters, Lloyds, the right to adjust claims of people who have property that was damaged or destroyed. It gives the underwriter the right to go ahead and defend litigation against the insured. It gives the underwriter the right and indeed the obligation to indemnify the insured in the event that there is legal liability on the part of the insured or there is liability on the part of the insured. And that is all contained within paragraph 10 of the general conditions section of the Lloyds policy, a policy that was written by a group of underwriters over in London.

The Court finds these observations persuasive. *See, e.g., DaCosta v. General Guaranty Ins. Co.*, 226 So.2d 104, 107 (Fla. 1969) ("Policy provisions requiring notice of accidents and claims, defense of suits by the Assurer, and prohibiting settlements by the Assured, usually indicate a liability rather than indemnity type of policy."). The Court additionally takes note of the appearance of the phrase "legal liability" in three salient positions in the policies at issue here. *See id.* at 107 ("The repetitive appearance after the initial assuring provision of fourteen clauses, twelve of which begin with the words 'liability for,' necessarily gives the policy reader the overall impression that protection is in the nature of liability indemnity.").

Paragraph 6 of the primary policy at issue, reproduced in its entirety, provides:

> 6. To the extent of 10% of the limit of liability stated in Section 2(A) as applicable at such premises, the Underwriters will pay for damage (except by fire) to that part of the building occupied by the Assured directly resulting from theft or any attempt thereat, provided the Assured is the owner of such premises or is *legally liable* for such damage; but in no event shall this section apply to glass or to any lettering or ornamentation thereon. The Underwriters' combined liability under this section and under Item (A) of Section 2 shall not exceed the amount of insurance shown under Item (A) of Section 2 for the premises at which such loss or damage occurs.

Policy para. 6 (DE 1, attachment) (emphasis added).

The "other insurance" clause contained in paragraph 11 of the policy reads as follows:

> 11. It is understood and agreed that any insurance granted herein shall not cover (excepting as to the *legal liability* of the Assured) when there is any other insurance which would attach if this policy had not been issued, whether such insurance be in the name of the insured or of any third party. It is, however, understood and agreed that, if under the terms of such other insurance (in the absence of this policy) the liability would be for a lesser amount than would have been recoverable

under this Policy (in the absence of such other policy), then this Policy attaches on the difference.

Policy para. 11 (DE 1, attachment) (emphasis added).

Finally, paragraph 3 of the primary policy issued by Lloyds reads:

### PROPERTY INSURED

3. The property insured is as follows:
(A) Pearls, precious and semi-precious stones, jewels, jewellery, watches and watch movements, gold, silver, platinum, other precious metals, and alloys and other stock usual to the conduct of the Assured's business, owned by the Assured;
(B) Property as above described, delivered or entrusted to the Assured by others who are not dealers in such property or otherwise engaged in the jewellery trade;
(C) Property as above described, delivered or entrusted to the Assured by others who are dealers in such property or otherwise engaged in the jewellery trade, but only to the extent of the Assured's own actual interest therein because of money actually advanced thereon, or *legal liability* for loss or damage thereto.

Policy para. 3 (DE 1, attachment) (emphasis added).[12]

A contract of insurance should be construed to give effect to the intention of the parties at the time of the execution of the contract. But from the foregoing, it should be apparent that, at very least, some ambiguity exists as to whether the parties intended to create a contract affording only property, or property plus liability, coverage. Ambiguities, however, must be construed against the insurer, and in favor of the insured, *Stuyvesant Ins. Co. v. Butler*, 314 So.2d 567 (Fla.1975), as the insurer is generally responsible for drafting the instrument. *See Security Ins. Co. v. Investors Diversified Ltd.*, 407 So.2d 314, 316 (Fla. 4th DCA 1981); *see also National*

*Union Fire Ins. Co v. Carib Aviation, Inc.*, 759 F.2d 873 (11th Cir.1985).

Such principles of construction were invoked by the court in the case of *Highlands Ins. Co. v. Galveston*, 721 S.W.2d 469 (Tex.Ct.App.1986), when faced with a similar dilemma to that at present. In *Highlands*, "all risk" policies were issued by a number of insurers to indemnify the city for any "loss damage or expense of whatsoever nature" to property "for which the assured may be liable or may assume liability." *Id.* at 470. Following issuance of the policies, a barge was pierced by a bolt protruding from a pier at the Galveston Wharves. The barge sank, and the barge owner sued the city. When the city looked toward the insurers for coverage, appellee insurers, seeking to avoid primary liability under its policies, insisted that the all risk policies at issue provided only *property* coverage, and as a result, the city had no insurable interest, since the barge was not within the city's "care, custody and control." *Id.* at 471.

The court disagreed, and read the liability language quoted above to afford *both property and liability* coverage. The court wrote:

> We understand the distinction between property insurance and liability insurance. Many policies involve both. A policy of property insurance is a personal contract for indemnity for the insurable interest possessed by the insured at the time of the issuance of the policy, and also at the time of the loss. Property insurance policies are 'intended solely to indemnify the insured for his actual monetary loss by the occurrence of the disaster; unless the assured has sustained an actual loss, the insurer has no liability.' Liability policies, on the other hand, insure against loss arising out of *legal liability*, usually based upon the assured's negligence.

*Id.* (citations omitted).

*Intervenors' Right of Recovery*

■ Paragraph 3 quoted above, *see supra* p. 1540, and language of similar import

---

**12.** *But see Home Ins. Co. v. Balfour–Guthrie Ins, Co.*, 13 Ariz.App. 327, 330, 476 P.2d 533, 536 (1970) ("it is clear that all of the coverage provided by paragraph 3 of the policy is 'property' insurance, and not that type of insurance commonly referred to as 'liability' insurance").

is standard to most forms of jeweler's block policies. *See, e.g., 1 Couch on Insurance* § 1:70, at 208 (1984 & Supp.1989). Such a clause creates three individual classes of covered property. As explained in applicable provisions of *Florida Jurisprudence:*

> The standardized Jewelers Block Policy provides coverage for three principal exposures: (1) The jeweler's own stock in trade owned by him [category 3(A) property], (2) articles in the jeweler's custody belonging to customers who are not dealers, that is, for repair, remounting, appraisal, etc. [category 3(B) property], and (3) articles in his custody belonging to others who are dealers or engaged in the jewelry trade, that is, on consignment, etc. [category 3(C) property]. *The insurance for (1) and (2) is extended as indemnity, while property entrusted to the assured by dealers is insured 'only to the extent of the Assured's own actual interest therein because of money actually advanced thereon, or legal liability for loss of or damage thereto.'*

*31 Fla.Jur.2d* Insurance § 719 n. 1 (1981 & Supp.1990) (quoting *Jewelers Mut. Ins. Co. v. Balogh,* 272 F.2d 889 (5th Cir.1959)).

The court in *Jeweler's Mutual Insurance Co. v. Balogh,* 272 F.2d 889 (5th Cir. 1959)[13], explained the reason for differentiating between such various classifications of property. The court reasoned that to cover only property owned by the jeweler, i.e., category 3(A) property, would

> leave the jeweler with wide exposures which jeopardizes not only his pocketbook but also his good will as a loss forces him into legal controversy with his clientele or a source of inventory supplied. The minimum requirement is protection against *legal* liability to those in (B) and (C)—an objective which can be achieved either by making the insurance available to them as third party beneficiaries or by casting it in the form of legal liability.

*Id.* at 893. As the above-quoted paragraph demonstrates, the desired result—coverage for the jeweler in the event that property held in his possession is lost or stolen—is achieved either by casting his block policy in terms of legal liability, or by making coverage under the policy available to owners or consignors of such goods as third party beneficiaries. In either case, the result is substantially similar. The parties to a jeweler's block policy, in contemplating and providing for legal liability coverage, are said to have anticipated and accounted for the fact that in the jewelry business, substantial portions of the goods held by most dealers are, as a matter of course, held on consignment for other dealers. And since the parties to a jeweler's block policy provide coverage to protect the assured from legal liability, an interest is created in the consignor of goods to the assured, regardless of whether the above objective is accomplished by "making the insurance available to them as third party beneficiaries or by casting it in the form of legal liability." *Id.* In either case, a substantial interest is created in the consignor of the goods covered. It is uncontroverted that the type of property at issue between the parties here is paragraph 3(C) property—the gold and precious metal held by plaintiff corporations, on consignment from intervenors Leach & Garner and Westway. The question becomes, then, whether the interest held by consignors of paragraph 3(C) property is so substantial as to create a beneficial interest, hence a direct right of recovery, in the consignor arising from the legal liability of the assured.

The holding in the *Jewelers Mutual* decision is highly instructive to these issues, and serves to point as well to some of the *differences* provided by coverage afforded paragraph 3(A) property and paragraph 3(C) property. In *Jewelers Mutual,* Julien Balogh, the named assured under a virtually identical jeweler's block policy, suffered a loss of goods in two of the three categories enumerated above; goods he owned himself (category 3(A) goods), and those on consignment to him from his brother David and other jewelers (category 3(C) goods).

---

13. The case is binding by virtue of *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981).

After slashing through much of a spurious record, the Fifth Circuit Court of Appeals found that Julien was able to recover for his own loss, and that his brother David was permitted to similarly recover for his loss as well—because with regard to paragraph 3(C) property, the insurer "was liable because Julien had a legal liability as bailee." *Id.* at 893. The court added:

> If Julien was legally liable, the policy applied and on such a finding ... it mattered not whether the dealer-bailor had or had not recovered judgment.... This makes it unnecessary to base judgment or affirmance on the result in David's suits against his insurers.

*Id.* at 893 & n. 4. It should be clear, then, that recovery of paragraph 3(C) property, unlike recovery for property falling under paragraphs 3(A) or 3(B),[14] need only follow from a finding that the assured was somehow legally liable—as bailee or otherwise—for that property.

The above analysis supports the proposition that intervenors Leach & Garner and Westway, as consignors of vast amounts of the gold and jewelry at issue, should enjoy a direct right of recovery as the equivalent of third party beneficiaries and/or named co-insureds to the jeweler's block policy obtained by plaintiff corporations and issued by defendant Lloyds. *See, e.g., Cumis Ins. Society, Inc. v. Republic Nat'l Bank,* 480 S.W.2d 762, 767 (Tex.Ct.App. 1972) (noting popular principle that "the owner of identifiable property which has been insured for its full value by a bailee, trustee, or agent, may recover in a direct

action against the insurer, though the contract contains no language expressly stating that the loss is payable to the owner or that the contract is made for his benefit."). The Court is cognizant, however, that such recovery is subject to the limitations and conditions of Section 627.7262, Florida Statutes (1989), as that statute relates to unnamed beneficiaries of liability policies.

■ The statute, however, does not put an end to the inquiry. The type of coverage afforded under Paragraph 3(C), as shown above, need not be dependent upon a third party beneficiary theory of recovery, but rather upon the establishment of legal liability on the part of the assured for the goods on consignment to him from dealers in such property. Recovery may also be premised upon the consignors' status as lender loss payees or named co-insureds, as the policies are herein reformed to state.

The Court has made clear, by virtue of its ruling on Lloyds' affirmative defenses numbers IV and VI, that plaintiff corporations are precluded from recovery under the terms of the policies at issue. The interests created thereby, however, through operation of the liability coverage portions of the jeweler's block policy, which create coverage for the legal liability of the insured, should now come to the fore to protect the interests of intervenors Leach & Garner and Westway, both equitable and actual owners of the substantial majority of the goods taken from the premises of plaintiff corporations on February 10, 1983

---

**14.** Recovery for property falling under paragraphs 3(A) and 3(B) is rather in the nature of true indemnity coverage, providing for direct recovery for the entire amount of the loss without regard to legal liability. In fact, at least one court has hinted, and another held, that the language of Paragraph 3(B) of policies practically identical to the one at issue here creates actual third party beneficiary rights in the consignors. In *Leonard Taylor Jewelers, Inc. v. Hartnett, Inc.,* 222 So.2d 243 (Fla. 3d DCA 1969), the court, in dicta, characterized jeweler's block insurance as "made for the benefit of the consignors as well as for the consignee ... which gives to the consignors a right of direct recovery for loss sustained thereunder." *Id.* at 244. The court in *Klein v. Sura Jewelry Mfg. Corp.,* 53 A.D.2d 854, 385 N.Y.S.2d 363 (1976), was a bit more direct, and actually held that the 3(B)

clause quoted above, *see supra* p. 26, created third party beneficiary rights in the owner/consignor of the goods held by the covered jeweler. *Klein,* 385 N.Y.S.2d at 365 ("George Klein was a nondealer in jewelry; thus, he was a third-party beneficiary of the Fireman's Fund Jeweler's Block Policy."). Likewise, the court in *Jewelers Mut. Ins. Co. v. Balogh,* 272 F.2d 889 (5th Cir.1959), found the type of coverage afforded Paragraph 3(B) property clearly distinguishable from that afforded 3(C) property, stating that the coverage afforded 3(B) property, or property owned by non-dealers, is "direct indemnity for the non-dealer bailor as a third party beneficiary," and as such, "the underwriters' liability was not that of legal liability of the assured, but rather the direct obligation to pay." *Id.* at 895.

—provided that plaintiff corporations are in some way liable for the loss therefore. *See 10A Couch on Insurance 2d* § 42:100 (1982 & Supp.1989) ("If coverage is stated in terms of 'liability' of the insured for the property, it is essential to coverage that there exist such liability. From this it follows that a policy insuring a furrier against loss of his goods and those for which he is 'responsible' as bailee does not cover bailed goods as to which he was not negligent, since in such case he is not responsible therefore, the word 'responsible' in such a policy meaning legal liability only." (footnote omitted)). The legal liability of plaintiff corporations Golden Door and Suisse Gold is clearly established by those companies' mutual failure to return the goods held on consignment from intervenors Leach & Garner and Westway, pursuant to the terms of those companies' respective consignment agreements. *See* Motion of Leach & Garner Company for Summary Judgment Against Defendants Pursuant to Federal Rule of Civil Procedure 56 (DE 551, exhibit D); Motion of Westway Metals Corporation for Summary Judgment Against Defendants (DE 554, exhibit D). Plaintiff corporations' breaches of said agreements, in the form of their independent failure to return or pay for the goods at issue, establishes the legal liability necessary to trigger the provisions of coverage provided in Paragraph 3(C) of the policies issued by Lloyds. Coverage in this sense, as coverage for legal liability under the liability portions of the policies, are not derivative in the way such rights might appear under a simple or open mortgage clause, but rather exist independently of the right of recovery of the plaintiff corporations and named assureds, Credin, Golden Door and Suisse Gold.

For those reasons, the Court shall proceed to effectuate the true purposes and objectives of the jeweler's block policy, and hence what it perceives to be the intent of the parties entering into a contract for coverage thereunder, by equitably reforming the contract to provide the consignors of the property with a right of direct recovery under the jeweler's block policy. The reformation hereinafter granted as a matter of law is based upon the legal liability of the named assureds to intervenors under the terms of those parties' respective consignment agreements, and the substantial interests of the intervenors resulting therefrom.

*Defenses Against the Insured*

Defendants Lloyds and Wright claim that even were the Court to accept intervenors' reasoning to this point, the intervenors would still be precluded from recovery by virtue of the operation of several exclusionary provisions which void recovery by the named assureds under the policies. Defendants point particularly to exclusionary clause 5(A), which provides an exception from coverage for "[l]oss, damage, or expense caused by or resulting from sabotage, theft, conversion or other act or omission of a dishonest character (1) on the part of the Assured or his or their employees, or (2) on the part of any person to whom the property hereby insured may be delivered or entrusted...." Policy para. 3 (DE 1, attachment).

In an attempt to avoid operation of the exclusion, the intervenors emphasize in their motions the basic distinction between one merely claiming a right to the proceeds of a policy, and one claiming a right under the policy itself. Westway explains the distinction:

> To the extent that a claimant is a claimant only as to the proceeds of the policy, the claimant's rights are derivative through the rights of the insured and the claimant has no rights greater than those of the named insured. In other words, in the event that some act or omission on the part of the named insured precludes the named insured from successfully maintaining an action against the policy, likewise a claimant merely claiming against the proceeds is similarly barred. To the contrary, however, if the claimant claims against the policy, the claimant is not subject to those defenses which constitute an avoidance as to the named insured.

Motion of Westway Metals Corporation for Summary Judgment Against Defendants 14 (DE 554) (footnote omitted).

Intervenor Leach & Garner and Westway's status as the former, as entitled to the *proceeds* of the policy, is established by its perfected security interest in the consigned goods, and is confirmed by (at least Westway's) being named loss payee under an endorsement to the policies. This status does not provide for recovery by these intervenors, however, in the event that Golden Door and Suisse Gold were to be held unable to recover under the policy. That now being the case by virtue of the Court's granting of partial summary judgment in favor of defendants Lloyds and Wright on two of their affirmative defenses, intervenors must instead advance their arguments as to their respective rights to recover directly under the policy itself. Hence Westway now repeats its argument that it is not a mere "loss payee" under a property policy, but a "lender loss payee," a "mortgagee," an "intended insured," or a "third party beneficiary," under the liability insurance elements of the jeweler's block policies. Likewise, Leach & Garner seek third party beneficiary status, or in the alternative, request reformation to be named as "lender loss payee." [15]

Defendants Lloyds and Wright repeat in response their argument that the phrase appearing on the endorsement naming Lawrence Systems, Inc. as "first mortgagee, as interest may appear," is dispositive as to the status of the intervenors. The phrase is traditionally construed to bestow loss payee status upon the named party. But Westway argues that in Florida, the phrase "includes liability, as well as property interests," quoting *Dyson & Co. v. Flood Engineers, Architects, Planners, Inc.*, 523 So.2d 756 (Fla. 1st DCA 1988). The Court has already shown sympathy toward intervenors' interpretation of the *Dyson* case, a case construing the language of a builder's risk policy, as useful in comprehending the dynamics of a policy providing elements of both property and liability coverage. The Court shall continue to follow the lead established thereby in clarifying the parties respective rights of recovery under the jeweler's block policies at issue here, and shall reinterpret the contract between the parties to provide both property and liability coverage under its terms.

The Court has noted that the parties to a jeweler's block policy, in contemplating and providing for legal liability coverage, are said to have anticipated and accounted for the fact that in the jewelry business, substantial portions of the goods held by dealers are often held on consignment from other dealers. The assured, in protecting his own legal liability by obtaining a jeweler's block policy, thereby creates a substantial interest in the consignor of goods. And whether that objective is obtained by "making the insurance available to [the consignors] as third party beneficiaries or by casting it in the form of legal liability," the resulting coverage is substantially similar. *Jeweler's Mut. Ins. Co. v. Balogh*, 272 F.2d 889, 893 (5th Cir.1959). In either case, a substantial interest is created in the consignor of the goods covered—an interest which must be accounted for in the agreement between the parties.

"A court of equity has the power to reform a written instrument where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument." *Providence Square Assoc., Inc. v. Biancardi*, 507 So.2d 1366, 1369 (Fla.1987), *quoted in Sierra v. Albers*, 540 So.2d 907 (Fla. 2d DCA 1989). A policy for insurance may be reformed, even after

---

**15.** The distinction between being named a "loss payee" and a "lender loss payee" is a great deal more than semantic. It reflects, in fact, intervenors' distinction between one merely claiming a right to the proceeds of a policy, and one claiming a right under the policy itself.

A party named in a standard mortgage clause, analogous to the position held by a "lender loss payee," is by operation of the clause made party to a distinct and separate contract with the insurer, and is generally not subject to defenses viable against the named assured. *See 10A Couch on Insurance 2d* § 42:683 (1982 & Supp. 1989); *see also Vernon Foodliner, Inc. v. Central Mut. Ins. Co.*, 1 Conn.App. 595, 474 A.2d 468 (1984) (intervening plaintiff named as "lender loss payee" was entitled to receive payment from the available proceeds to the extent of its interest at time of loss, and was not subject to statute of limitations defense which precluded recovery by named insured).

loss, so as to express the real agreement between the parties. *Gibson v. American Ins. Co.*, 146 Fla. 171, 200 So. 357 (1941). These same principles apply equally to contracts providing liability coverage, *Hanover Ins. Co. v. Publix Market, Inc.*, 198 So.2d 346 (Fla. 4th DCA 1967), as well as other hybrid policies, including those providing builder's risk coverage. *Manhattan Fire & Marine Ins. Co. v. Sommers*, 222 So.2d 450 (Fla. 4th DCA 1969). Reformation has likewise been upheld in cases where the parties were mutually mistaken as to the legal effect of the policies' loss payable provisions. *Leon A. Minsky, Inc. v. Providence Fashions, Inc.*, 404 So.2d 1275 (La.App.), *cert. denied*, 407 So.2d 731 (1981); *see also 17 Couch on Insurance* § 66:62 (1983 & Supp.1989).

■ Such mutual mistake need not be purely a mistake of fact. Mutual mistake as to the law, or the legal significance of the various contractual provisions, has likewise given courts equitable power to reform policies in accordance with what the court perceives to be the true intent of the parties. *See 17 Couch on Insurance* § 66:62, at 346 (1983 & Supp.1989) ("The mistake in such cases may be one of law, as where the mortgagee and the agent of the insurer supposed that a policy issued to the mortgagor, payable in case of loss to the mortgagee, was the proper legal method of covering the interest of the mortgagee; under such circumstances the court will reform the policy, since it is a mutual mistake in filling out the papers, and it is also held that it is immaterial whether the mistake is one of law or fact." (citation omitted)); *see also In re 6804 East, Inc.*, 42 B.R. 903 (Bankr.M.D.Fla.1984); *17 Couch on Insurance* §§ 66:40, 66:41 (1983 & Supp.1989) (citing *Tokio Marine & Fire Ins. Co. v. National Union Fire Ins. Co.*, 91 F.2d 964 (2d Cir.1937); *Taylor v. Audubon Ins. Co.*, 357 So.2d 912 (La.App.), *cert. denied*, 359 So.2d 1307 (1978)); *30 Fla. Jur.2d Insurance* § 441 (1981 & Supp.1990) (citing *Gibson v. American Ins. Co.*, 146 Fla. 171, 200 So. 357 (1941); *Napoli v. Liberty Mut. Ins. Co.*, 364 So.2d 878 (Fla. 4th DCA 1978)).

■ Equitable reformation has likewise been endorsed and affirmed in cases where, as here, the true owner or owners of the interests in question were not represented in the policies as written. *See, e.g., Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211 (5th Cir. 1969); *Taylor v. Audubon Ins. Co.*, 357 So.2d 912 (La.App.), *cert. denied*, 359 So.2d 1307 (1978); *Manhattan Fire & Marine Ins. Co. v. Sommers*, 222 So.2d 450 (Fla. 4th DCA 1969) (reformation of liability insurance elements of builder's risk policy to reflect true parties at risk); *Erickson Refrigerated Trans., Inc. v. Canal Ins. Co*, 474 S.W.2d 337 (Mo.App.1971) (policy reformed to make transport company named insured following mutual mistake in interpretation of loss payable clause).

In *Lighting Fixture & Electric Supply Co. v. Continental Insurance Co.*, 420 F.2d 1211 (5th Cir.1969), the Fifth Circuit Court of Appeals affirmed the district court's grant of partial summary judgment, permitting plaintiff to recover under a "multi-peril" policy as reformed, despite the fact that plaintiff was not the named insured under the policy. In that case, a building owned by plaintiff Lighting Fixture was severely damaged by fire. Defendant Continental denied coverage to plaintiff, as the policy had been issued in the name of another company. The district court held, on cross motions for summary judgment, in favor of the unnamed plaintiff, concluding that there was "no genuine issue as to any material fact on the question of liability and that the insurance policy involved [t]herein should be reformed to reflect plaintiff's ownership of the real property which is the subject matter of this case." *Id.* at 1213.

The Court of Appeals affirmed that conclusion, noting additionally that

Reformation could be had in a Florida court if it were clear that Continental had actual knowledge that Lighting Fixture or some other person rather than Electric Supply owned the building. Reformation could also be required if it were clear that the actions of Continental's agent amounted to an 'independent investigation' under Florida law. In this situation the 'general proposition that the insurer is charged with all knowledge

that it *might* have obtained had it pursued the independent inquiry to the end with reasonable diligence and completeness' would apply ... and knowledge of Lighting Fixture's interest in the building would be imputable to Continental.

. . . . .

In view of this policy, we believe that when an insurer and its customer agree that the insurer is to insure the owner of specified property against fire loss, it would be no less unconscionable to allow the insurer to avoid its obligations under their contract because the owner, whose identity is of no particular concern to the insurer, is incorrectly named in that contract than to allow such avoidance because the insurer in preparing the policy acted unmindful of facts it either knew or should have known.

*Id.* at 1214–15 (citations omitted).

■ Either of the principles articulated above may be applied to this case. Jeweler's block insurance was created out of concern for the frequent transportation and exchange of covered goods between owners, and the difficulties inherent in explicitly naming all individuals thereby entitled to coverage. Even were it not known that the majority of the goods held by plaintiff corporations and insured by Lloyds belonged specifically to Leach & Garner and Westway, knowledge that a majority of the goods insured were owned by those other than the named insureds could be imputed to defendants by standard industry practice, *see* affidavit of John T. Klagholtz (DE 534, attachment), and by the structure and language of the policy itself. *Compare* Policy, para. 3(A) (providing coverage for jeweler's property) *with* paras. 3(B) and 3(C) (providing coverage for property held for repair or on consignment, owned by those other than named assured). Certainly such knowledge would have been forthcoming had Lloyds "pursued the independent inquiry to the end with reasonable diligence and completeness." *Lighting Fixture,* 420 F.2d 1211, 1214. *See also Taylor v. Audubon Ins. Co.,* 357 So.2d 912 (La.App.) (fire insurance policy reformed so as to recognize the unnamed owner of the insured property, further permitting owner to recover on the policy free and clear of

the defenses the insurer articulated against the named insured), *cert. denied,* 359 So.2d 1307 (1978); *Leon A. Minsky, Inc. v. Providence Fashions,* 404 So.2d 1275, 1279 (La. App.) (interpreting *Taylor* to stand for the proposition that "under the appropriate factual situation, a court has the authority to grant reformation of the loss payable clause of an insurance contract to prevent an unjust enrichment"), *cert. denied,* 407 So.2d 731 (1981).

Given that the consignors' right of recovery as to Paragraph 3(B) property appears not to be derivative, but stems directly from recovery as a third party beneficiary to the policy, *see supra* note 14, and given this Court's earlier legal conclusion to the effect that by the nature of the policy and practice common to the industry, consignors of merchandise to named assureds stand as the equivalent of third party beneficiaries to such policies, though they must additionally demonstrate in some way, though not necessarily through independent judgment, the legal liability of the assured in the case of Paragraph 3(C)-type property, the Court now concludes that the policies at issue should be reformed to allow intervenors to exercise a direct right of recovery against the insurer.

The current policies are therefore reformed to reflect the interests of intervenors and consignors of merchandise Leach & Garner and Westway as lender loss payees, or, in the alternative, as named and innocent co-insureds. As such, Leach & Garner and Westway are entitled to the benefits of the policies, free and clear of any potential defenses Lloyds may retain or invoke against either Credin, Golden Door, or Suisse Gold.

### CONCLUSION

It is concluded, as a matter of law, that there is currently no basis by which defendants Lloyds and Wright can question that intervenors Leach & Garner and Westway were consignors of gold and other items to named assureds Golden Door and Suisse Gold. It is likewise concluded that plaintiff corporations' failure to return these goods or pay for same establishes unconditionally

a breach of the respective consignment agreements entered into between these parties, and thereby established plaintiff corporations' legal liability for said goods. Accordingly, this finding of legal liability brings to fore the protections afforded all interested parties under the terms of the named assureds' jewelers block policies, and provides plaintiff intervenors Leach & Garner and Westway with a direct means of recovery under the policies held by plaintiff corporations, as issued by defendant Lloyds.

Based on the foregoing, it is hereby

ORDERED AND ADJUDGED as follows:

1. The Court concludes, as a matter of law, that the position taken by plaintiff/intervenors both overtly and by adoption with regard to the matter of reformation is valid. The Court finds that the position occupied by intervenors Leach & Garner and Westway is most akin to their being named as lender loss payees and/or named co-insureds to the policies, in order to reflect their positions as the actual owners of the goods on consignment to plaintiff corporations. Said policy is hereby REFORMED to so name intervenors WESTWAY METALS, INC. and LEACH & GARNER COMPANY.

2. Following from Paragraph 1 above, intervenor WESTWAY METALS CORPORATION's Motion for Summary Judgment be, and the same is hereby GRANTED as to Count I of intervenor Westway's Amended Complaint. Summary Judgment is hereby entered in favor of Westway and against Lloyds in the amount of *$4,979,-852.67*, plus interest at the legal rate accruing from February 10, 1983. Counsel for intervenor Westway shall prepare and submit a proposed final judgment in accordance herewith together with costs to be taxed by the Clerk of this Court upon the filing of an appropriate bill of cost form.

3. That intervenor LEACH & GARNER COMPANY's Motion for Summary Judgment be, and the same is hereby GRANTED as to Count I of its Intervenor Complaint. Summary Judgment is hereby entered in favor of Leach & Garner and against Peter Frederick Wright in the amount of *$2,661,418.82* plus interest at the legal rate accruing from February 10, 1983. Counsel for intervenor Leach & Garner shall prepare and submit a proposed final judgment in accordance herewith together with costs to be taxed by the Clerk of this Court upon the filing of an appropriate bill of cost form.

4. Counsel for intervenors shall, within 30 days hereafter, submit requests for attorney's fees and memoranda of law citing the grounds for seeking such award and the final amount sought, with time slips and/or summaries attached as appropriate, and affidavits supporting the amount sought. Defendants shall submit appropriate responsive memoranda within 30 days thereafter. If necessary, an evidentiary hearing thereon will be held.

5. Costs are awarded to plaintiff intervenors Leach & Garner and Westway and against defendants Lloyds and Wright, to be taxed by the Clerk of this Court upon the filing of appropriate bill of cost forms. The Court reserves jurisdiction to refer this matter, as well as motions for attorney's fees, to the Special Master if necessary.

6. That following from the Court's ruling as set forth herein, in favor of defendants LLOYDS and PETER FREDERICK WRIGHT on Defendants' Motion for Partial Summary Judgment on its affirmative defenses numbers IV and VII, all claims made by plaintiffs Credin, Golden Door, and Suisse Gold are hereby DENIED as to any and all relief sought. This does not, detract or otherwise interfere with the rulings favorable to the intervenors herein under the all risk policies at issue.

7. The respective claims of intervenors STERN METALS and CAPITAL BANK are hereby DENIED WITHOUT PREJUDICE. Both seek to recover an amount owing to plaintiff corporations; Stern seeking to enforce a final judgment obtained against Golden Door, and Capital Bank seeking to recover upon its perfected security interest as against Suisse Gold. Unlike intervenors Leach & Garner and Westway, intervenors Stern and Capital Bank are merely entitled to the proceeds of a policy, and have no claim against the

policy itself. But according to the Court's ruling in paragraph 4, above, both plaintiff corporations have been declared incapable of recovery in this action, leaving no proceeds against which these intervenors might recover.

8. The remainder of defendants' motions for summary judgment be, for reasons enumerated *supra* notes 3–8, DENIED in their entirety.

9. Intervenor Leach & Garner's Motion to Strike Amended Statements Pursuant to Rule 10.J.2 Filed by Defendants, as well as its Motion to Strike the Eight Pending Motions of Defendants for Summary Judgment are hereby DENIED AS MOOT.

10. That all remaining motions currently pending before either the Court or before the Special Master are hereby DENIED AS MOOT by virtue of the rulings rendered herein.

DONE AND ORDERED.