GOLDEN DOOR JEWELRY CREATIONS, INC., Plaintiff, Suisse Gold Assayer & Refinery, Inc., Plaintiff, Leach & Garner Co., Plaintiff/Intervenor, Westway Metals Corp., Plaintiff/Intervenor, Capital Bank, Plaintiff/Intervenor, Stern Metals Corp., Plaintiff/Intervenor,

v.

LLOYDS UNDERWRITERS, Defendant, Peter Frederick Wright, Defendant, Sanford Credin, Intervenor Defendant, Lawrence Systems, Inc., Intervenor Defendant.

LEACH & GARNER CO., Plaintiff,

v.

Peter Frederick WRIGHT, Defendant.

Nos. 83–1409–CIV, 84–0354–CIV.

United States District Court,
S.D. Florida.

Feb. 21, 1991.

Herbert P. Polk, Whitman & Ransom, New York City, for Lloyds Underwriters.

Paul H. Bass, Krongold & Bass, Coral Gables, Fla., David Russell, Walters Cos-

tanzo Miller & Russell, Miami, Fla., for Golden Door.

Joseph L. Rebak, Tew, Garcia–Pedrosa & Borgognoni, Miami, Fla., Irving Slifkin, Englewood Cliffs, N.J., for Westway Metals.

John H. Phelan, Kimbrell & Hamann, Christopher Barkas, Wicker, Smith, Blomqvist, Tutan, O'Hara, McCoy, Graham & Lane, Miami, Fla., for Lawrence Systems.

Henry Latimer, Fine, Jacobson, Schwartz, Nash, Block & England, Fort Lauderdale, Fla., Special Master.

Hilarie Bass, Greenberg, Traurig, Askew, Hoffman, Lipoff, Rosen & Quentel, Miami, Fla., for Capital Bank.

Dyanne E. Feinberg, Gilbride, Heller & Brown, Miami, Fla., for Stern Metals, Inc.

Ronald B. Hamilton, Cozen & O'Connor, Philadelphia, Pa., for Leach & Garner Co.

## OMNIBUS ORDER ADDRESSING POST–ORDER (10/11/90) MOTIONS

ARONOVITZ, District Judge.

THIS CAUSE came before the Court upon numerous filings submitted following and in response to the Court's October 11, 1990 Order Granting Plaintiffs/Intervenors Leach & Garner Company and Westway Metals Corporation's Motions for Summary Judgment and Addressing Defendant Lloyds Underwriters' Motions for Summary Judgment and/or Other Relief Requested (hereinafter "Order").

THE COURT has considered all such post-Order filings, responses and replies, the pertinent portions of the record, and, on January 23, 1991, heard lengthy and exhaustive oral argument thereon. While the Court's fundamental findings and conclusions remain unchanged, they are clarified and supplemented by what follows:

THE COURT's Order of October 11, 1990 effectively denied relief sought by Defendants LLOYDS UNDERWRITERS and PETER FREDERICK WRIGHT (hereinafter collectively referred to as "Defendants"), and granted in their entirety Plaintiff Intervenors' LEACH & GARNER COMPA-NY and WESTWAY METALS CORPORA-TION's (hereinafter collectively referred to as "Intervenors") respective motions for summary judgment. In so doing, the Court reformed the underlying policies of insurance to provide coverage for these consignors, in accord with what the Court perceived to be the intent of the parties to the policies and underlying agreements.

In that Order, the Court summarized as follows:

> The Court now concludes, as a matter of law, that a jeweler's block policy does not simply represent a combination of a number of existing types of insurance, but is rather in the nature of a new type of insurance; an all risk policy containing elements of both property and liability coverage. And since the jeweler's block policy provides coverage to protect the assured from legal liability, a substantial interest is thereby created in the consignor of goods to the assured. The Court finds therefore, again, as a matter of law and by the nature of the policy and practice common to the industry, that consignors of merchandise to named assureds stand as the equivalent of third party beneficiaries and/or named co-insureds under such policies, and that the policies should permit a direct right of recovery against the insurer by those consignors. The Court further concludes, by virtue of the nature of the policy involved, that plaintiff/intervenors Westway and Leach & Garner may claim against the policy issued by Lloyds without regard to the alleged fraudulent acts of named assured Sandy Credin, and plaintiff intervenors are thus entitled to judgment in the full amount claimed as a matter of law.

Order, 748 F.Supp. 1529, 1536–37 (S.D.Fla. 1990). The Court's ruling reviewed at length the historical premises behind and evolution of the jeweler's block policy. From such an analysis, the Court concluded:

> Thus, a jeweler's block policy does not simply represent a combination of a number of existing types of insurance, but is

rather a new type of insurance born out of more traditional inland marine policies.

*Id.* at 1539. The Court further noted that: The structure of Florida's permissive legislation comports with this historical analysis.

*Id.* (citing, *inter alia,* Fla.Stat. § 624.607(3) (1989); Fla.Admin.Code R. 4–48.003 (1989) (permissive legislation under which the Florida Legislature authorized issuance of jewelers' block policies as "all risk" policies)).

Construed as such, an ambiguity became apparent,[1] and since it was Lloyds which not only originated the concept of jeweler's block coverage, *see* Order, 748 F.Supp. at 1537 (quoting *Woods Patchogue Corp. v. Franklin Nat'l Ins. Co.,* 5 N.Y.2d 479, 186 N.Y.S.2d 42, 45, 158 N.E.2d 710, 712 (1959) ("[t]he idea was conceived by a Lloyds of London underwriter at the turn of the century")), but which was responsible for drafting the policies at issue here, the Court was impelled to apply the established rule that ambiguities must routinely be construed against the drafters of such instruments. The Court then concluded, as set forth in its Order of October 11 and further clarified herein, that under the terms of the policy and the consignment agreements between the parties, the historical premises behind jeweler's block coverage generally, and practices standard within the industry, that it need not reach the question of whether the alleged dishonest act was actually committed by the assured, because the liability portions of the jeweler's block policy and the obligations to third parties created thereby, *as a matter of law* override any exclusions which, by virtue of historical necessity, prevent a named insured from *personally* recovering by virtue of his or her own wrongdoing. *See infra* § B., at 13–16. Defendants Lloyds and Wright, in their numerous filings, put forth the following points by which the Court might reconsider its ruling and Order.

## A. COVERED PROPERTY: "DELIVERY" VS. "ENTRUSTMENT," AND WHETHER EITHER MAY BE FOUND TO EXIST AS A MATTER OF LAW THROUGH THE CONSIGNMENT AGREEMENTS

Defendants, in their Motion for Reconsideration and/or Motion to Alter or Amend Judgment, file dated October 25, 1990, and in subsequent filings, ask that the Court reconsider its October 11 Order as triable issues of material fact remain with regard to whether coverage exists under the policies for the property at issue in this litigation. Defendants suggest that, even assuming there is coverage for the assureds' liability, it is a condition precedent to any recovery that such liability is for loss to 'property insured' under the policy provisions. Defendants continue that this very issue was cast into doubt in Lloyds' Motion for Summary Judgment Number 1 (DE 191), wherein Lloyds claimed that the gold was never "delivered or entrusted to the insured" as required by the policies, but rather that the metals were specifically delivered and entrusted to the warehouseman, Lawrence Systems. Defendants cite in further support footnote 3 of the October 11 Order, in which the Court denied Lloyds' motion for summary judgment because:

---

**1.** Defendants created and entered into policies which simultaneously had the effect of providing coverage to third parties for any legal liability incurred by the named assureds, yet also wrote into the policy exclusions from coverage for dishonest acts on the part of the assureds. The policy failed to address specifically, however, whether coverage is provided to these third parties when the legal liability of the assured, otherwise covered under the policy, is triggered at least in part by what might very well have been some dishonest act on the part of said assured. In an attempt to resolve these ambiguities, the Court was forced repeatedly to look toward the respective consignment agreements executed between intervenors and assureds in order to gain greater understanding of the status intended for intervenors under the policies issued by Lloyds. The Court found that the factual scenario underlying this case, taken with the maxim, deeply entrenched in Florida contract law, that ambiguities are routinely construed against the drafters of the various instruments, justified, necessitated and indeed required that the Court revisit and reform the policies issued by Defendants.

questions of fact remain[ed] concern[ing] whether warehouseman Lawrence retained independent control of the goods once delivered, and if so, whether the delivery was made to Lawrence or to [Suisse Gold and/or Golden Door].

Order, 748 F.Supp. 1529, 1534 n. 3 (S.D.Fla. 1990). Yet, as Defendants point out, the Court also found in its Order that:

[i]t is uncontroverted that the type of property at issue between the parties here is paragraph 3(c) property—the gold and precious metal held by plaintiff corporations, on consignment from intervenors Leach & Garner and Westway.

*Id.* at 1541.

The crux of Defendants' argument on this issue is that these two findings are contradictory—that "th[e] Court did not make a legal determination that there was an entrustment of goods to the plaintiff's corporations, but merely referred to the fact that the intervenors' property would fall under the provisions of Paragraph 3(c) of the Property Insured Definitions ... If this Court determined as a matter of law that the property was entrusted to the plaintiff's corporations then there would be no reason for this Court to have denied Lloyds' Motion for Summary Judgment based upon factual questions regarding delivery." Lloyds' Reply, file dated December 3, 1990, at 2. At very least, Lloyds suggests that the factual circumstances behind delivery demand further scrutiny, which should in turn preclude summary judgment on the issue.

Defendants Lloyds and Wright additionally assert that there could be no delivery in fact as there was no complete bailment of the goods in question, i.e., no complete delivery of possession, custody, and control as required by pertinent case law. *See, e.g., Puritan Ins. Co. v. Butler Aviation— Palm Beach, Inc.,* 715 F.2d 502 (11th Cir. 1983); *Blum v. Merrill Stevens Dry Dock Co.,* 409 So.2d 192 (Fla. 3d DCA 1982). Defendants insist that the factual issue of successful delivery remains, *despite* any language of the consignment agreements, that the consignment agreements only serve to "create an ambiguity as to their

scope," and therefore that such agreements cannot supply the basis for a summary judgment determination.

The Court once again takes note that coverage under the pertinent portions of the policies (Paragraph 3(C)) is predicated upon the property named therein being *"delivered or entrusted* to the Assured by others who are dealers in such property or otherwise engaged in the jewellery trade, but only to the extent of the Assured's own actual interest therein because of money actually advanced thereon, or legal liability for loss or damage thereto." Policy para. 3 (DE 1, attachment) (emphasis added). The concepts of delivery and entrustment are separate and distinct, for if they were not, then the drafters of the policy could merely have used the term "delivered." Both Westway and Leach & Garner go to great lengths to distinguish the two concepts, with numerous citations to pertinent case law. *See* Memorandum of Westway Metals Corp. in Opposition to Lloyds' Motion for Reconsideration and/or Motion to Alter or Amend Judgment, file dated November 15, 1990, at 3–11; Memorandum of Leach & Garner Company in Opposition to the Motion of Defendants for Reconsideration and/or Motion to Alter or Amend Judgment, file dated November 15, 1990, at 6–9.

█ In its Order of October 11, 1990, the Court held that while factual questions remained as to whether warehouseman Lawrence retained independent control of the goods once delivered, Order, 748 F.Supp. 1529, 1534 n. 3, by the same token, "[i]t is uncontroverted that the type of property at issue between the parties here is paragraph 3(c) property—the gold and precious metal held by plaintiff corporations, on consignment from intervenors Leach & Garner and Westway." *Id.* at 1541. Implicit from these findings is that the Court held entrustment to exist, as a matter of law, arising from obligations created by the consignment agreements. This finding and conclusion is now and hereby expressly reaffirmed. To arrive at such a finding, the Court looked to the consignment agreements existing between the parties, as it did whenever an ambiguity or uncertainty

arose regarding the status intended for intervenors under the policies issued by Defendants. The Court then made a finding that the gold had been entrusted to plaintiff corporations by the respective consignors, since it was the plaintiff corporations who (in several places throughout the consignment agreements), assumed the risk of loss for the gold so held. Indeed, such a finding of liability arising from the consignment agreements finds a great deal of support in the Record:

Paragraph 3(A) of the consignment agreement executed between intervenor Leach & Garner and Golden Door explicitly provides:

> The Buyer [Golden Door] shall be responsible to and shall reimburse and hold Seller [Leach & Garner] harmless for all loss and expense ... resulting from damage to or destruction of the Material, from levy, attachment, or any court process whatsoever, for any lien or claim of lien, or from any other liability arising from Buyer's possession of the material.

Leach & Garner's Consignment Agreement, para. 3(A) (DE 551, Exhibit D).

Likewise Paragraph 7 of the consignment agreement executed between intervenor Westway and Suisse Gold makes the consignee Suisse Gold responsible for "arranging the delivery of material to its vaults," and for "among other things, all transportation charges for armored car carriers," and provides that the consignee "will accept all risks of loss during delivery." Westway Consignment Agreement (DE 554, Exhibit D). This language makes clear that delivery and/or entrustment was a previously contemplated part of the relationship existing between the corporations by virtue of the consignment agreement. This point is further drawn out in the affidavit of Alain Farhi (DE 711), at pages 17–18 and 90–91, where Farhi explains the specific details of the delivery process. *See also* Westway's Response, at 5–8. It is clear to the Court, from these provisions and a number of others, that the working arrangement between Westway and Suisse Gold placed the risk of loss solely upon Suisse Gold both during and after delivery in Westway's location. *See* Westway Consignment Agreement para. 8 (DE 554, Exhibit D).

■ Finally, Defendants suggest that even were delivery completed, coverage would *still not exist* without a determination of negligence on the part of plaintiff corporations, as is required in an ordinary bailment for mutual benefit. Admittedly, the Court's October 11 ruling was in no way predicated upon or related to a finding that there was involved a bailment for mutual benefit. But it need not have been for the Court to conclusively establish Defendants' liability for the loss suffered. The Court, in its Order made clear that liability is *not* triggered by virtue of the bailee/bailor relationship existing between consignor and consignee, but rather that:

> recovery of paragraph 3(C) property ... need only follow from a finding that the assured was somehow legally liable—as bailee *or otherwise*—for that property.

*See* Order, 748 F.Supp. at 1542 (emphasis added, footnote omitted). Here, coverage was not held dependent or contingent upon principles of the bailor-bailee relationship, but upon principles of contractual liability. The policy entered into by the parties was an all risk policy, designed to protect insured property and provide liability coverage without regard to negligence. The bailee corporations' liability in this case—legal liability—should not be read only to follow from its negligent acts, i.e., tortious liability, but also from its *contractual liability*.

Indeed this principle was stated repeatedly by the Court in its October 11 Order. There the Court emphasized:

> The type of coverage afforded under Paragraph 3(C), as shown above, need not be dependent upon a third party beneficiary theory of recovery, but rather upon the establishment of legal liability on the part of the assured for the goods on consignment to him from dealers in such property.

*Id.* The Court continued:

> The legal liability of plaintiff corporations Golden Door and Suisse Gold is clearly established by those companies' mutual failure to return the goods held

on consignment from intervenors Leach & Garner and Westway, pursuant to the terms of those companies' respective consignment agreements ... Plaintiff corporations' breaches of said agreements, in the form of their independent failure to return or pay for the goods at issue, establishes the legal liability necessary to trigger the provisions of coverage provided in Paragraph 3(C) of the policies issued by Lloyds. Coverage in this sense, as coverage for legal liability under the liability portions of the policies, are not derivative in the way such rights might appear under a simple or open mortgage clause, but rather exist independently of the right of recovery of the plaintiff corporations and named assureds, Credin, Golden Door and Suisse Gold.

*Id.* at 1543 (citations to record omitted). Hence, it is neither necessary for the Court to find delivery to have taken place as a matter of fact, nor for the Court to find that the bailee corporations were liable for the property at issue under traditional principles of bailee-bailor liability. Rather, all that is required to trigger the protections offered by the Lloyds policy is a finding of "legal liability" on the part of the assured. This is a finding the Court has made clear, and one the Court is prepared to stand by.

## B. COVERED RISKS: OPERATION OF THE POLICIES' EXCLUSIONS AND PROTECTIONS AGAINST FRAUDULENT ACTS AGAINST THE INSURED

■ Defendants argue that even assuming the foregoing—that the property was delivered or entrusted and therefore covered under paragraph 3(c) of the policies— *such a loss is still not a covered risk under said policies.* Defendants argue this from a general common law principle of all risk policies; that they cover "every conceivable loss or damage except when occasioned by willful or fraudulent acts of the insured." *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.,* 446 F.Supp. 415 (M.D. Fla.1977) (citing *Sun Ins. Office v. Clay,* 133 So.2d 735 (Fla.1961)). Defendants argued similarly and strenuously in opposition to the intervenors' motions for summary judgment. There, Defendants argued that a policy exclusion [2] prevented such recovery, as intervenors may not stand in the shoes of a potentially wrongdoing plaintiff and still recover under the policies.

The Court put an end to this line of argumentation, however, when it made clear that the intervenors' respective rights of recovery under the policies were not derivative rights against the proceeds of the policies, but rather were direct rights of recovery against the policies themselves. Intervenors stand in no one's shoes but their own—and the public policy concerns which give rise to the maxim preventing a wrongdoing plaintiff from recovering under his or her policy of insurance should not now prevent innocent owners of covered property from recovering under a policy held to protect their interests.[3] *See Highlands Ins. Co. v. City of Galveston,* 721 S.W.2d 469 (Tex.Ct.App.1986); *see also Ev-*

---

**2.** Policy Exclusion 5(A) excepts from coverage:

[l]oss, damage, or expense caused by or resulting from sabotage, theft, conversion or other act or omission of a dishonest character (1) on the part of the Assured or his or their employees, or (2) on the part of any person to whom the property hereby insured may be delivered or entrusted ...
Policy para. 3 (DE 1, attachment).

**3.** Intervenors Leach & Garner summarize, rather cogently, as follows:

Lloyds would not dispute the proposition that if I intentionally commit an act of arson on my home in an attempt to collect the insurance proceeds, and if the insurance company denies the claim as to me, my mortgagee nevertheless is paid. Additionally, in those jurisdictions, like Florida, which recognize the innocent co-insured rule, my wife would also be paid under my homeowner's policy whether I intentionally destroyed my home or not. Again, this does not mean that my homeowner's policy is a fidelity bond, the distinction ... is simply that there is a difference between a claimant against the proceeds of the policy and a claimant against the policy. This Court has properly determined that Leach & Garner, as a lender loss payee, has rights which are not derivative from the rights of the insured, and hence, the claim against the policy is independent of any defense that may exist as to the insured.
Leach & Garner's Responsive Memorandum, file dated November 15, 1990, at 14.

*erglades Marina v. American Eastern Dev. Co.,* 374 So.2d 517 (Fla.1979).

■ Defendants have responded, somewhat predictably, that the Court's holding, which allows intervenors to recover despite the bad acts of the assureds, has the effect of promoting, and not deterring, theft or fraud. But absent proof or allegation of wrongdoing or collusion on the part of intervenors here, there is no more reason to place either intervenor at risk for the loss purportedly caused by plaintiff than to put the risk of loss on the insurer. There is no public policy mandating that the consignors assume the risk of loss. Rather, it is the *insurer* who is in a better position to investigate the prospective consignees prior to entering into a contract with them for jeweler's block coverage, and to calculate and assign a premium accordingly. It should not, and indeed, cannot be the responsibility of a consignor to investigate each and every potential consignee before acceding to coverage under a jeweler's block policy.[4] If one matter of policy is evident from the history and inception of jeweler's block insurance generally, it is that there are *so many* potential consignees that it would be impractical for a potential consignor—or anyone else—to consider and account for each and every risk of loss and each and every contingency. That is why jeweler's block policies were made "all-risk," and why they were enacted as such. *See* Order, 748 F.Supp. at 1536–40.

## C. REFORMATION: IS CLEAR AND CONVINCING EVIDENCE OF MUTUAL MISTAKE PRESENT, OR IS SUCH REQUIRED TO JUSTIFY THE COURTS' REFORMATION OF THE POLICIES?

■ Defendants assert that to justify reformation of policies like those at issue, the Court must specifically find that there was a definite prior agreement between the parties, the terms of which were not completely incorporated into the policy as issued. Further, such reformation must be premised upon the occurrence of fraud, accident, or mutual mistake. Defendants insist, as they have in the past, that this is at best an instance of unilateral mistake. Finally, Defendants assert, citing *Palilla v. St. Paul Fire Marine Ins. Co.,* 322 So.2d 46 (Fla 1st DCA 1975), that the party seeking reformation has the burden of proving the requisite elements by clear and convincing evidence.

Specifically, Defendants suggest that none of the individuals responsible for obtaining the jeweler's block policies for plaintiff corporations (neither Norman Newman nor his employer Great Northern) were agents of Lloyds, and therefore any mistakes made by them in procuring the policies from Lloyds and for plaintiff corporations were purely unilateral. The Court made abundantly clear in its Order, however, with suitable and adequate case citations, that there *did* appear to be mutual mistake here—specifically, mutual mistake between the contracting parties as to the precise legal implications of the policy itself, and the type of insurance it provided with respect to the consignors. *See Leon A. Minsky, Inc. v. Providence Fashions, Inc.,* 404 So.2d 1275 (La.App.1981), *cert. denied,* 407 So.2d 731 (1981); *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211 (5th Cir.1969). The Court now stands by its view of the pertinent case law and believes it to speak for itself in justifying the actions necessitated in this case.

## D. FED.R.CIV.P. 54(b): DETERMINATION OF "NO JUST REASON FOR DELAY" OF ENTRY OF JUDGMENT

■ In Defendant Lloyds' Memorandum in Opposition to Entry of Final Judgments, file dated November 15, 1990, Lloyds opposes the Court's entry of the proposed final judgments as submitted because it claims that the Court's Order of October 11 does not properly dispose of all claims before the Court under Rule 54(b). Lloyds,

---

**4.** The Court points out, more than merely in passing, that both consignment agreements existing between consignor/intervenors and consignee/plaintiff corporations were made ex- pressly contingent upon consignees obtaining satisfactory jewelers block coverage for the consigned merchandise.

pointing to the numerous counts of Westway's Complaint that it claims were not disposed of by the Order (including Counts II–VIII), contends that the October 11 Order addressed only Count I of Leach & Garner's Complaint and Count I of Westway's Complaint. Under these two Counts, intervenors sought recovery as loss payees. Lloyds writes, "This Court's order did not address Intervenor's request to reform the policy to substitute Leach & Garner or Westway in the loss payable clause naming Lawrence Systems." Lloyds also points out that the claims of Stern Metals and Capital Bank were denied *without prejudice*, and accordingly were not disposed of for purposes of Rule 54. Lloyds cites the operative language of Rule 54(b), insisting that since such claims were not definitively disposed of, all remain subject to revision absent "an express determination that there is no just reason for delay and ... an express direction for the entry of judgment." Fed.R.Civ.P. 54(b).

In response, Westway suggests that the Order of October 11 effectively disposed of all pending claims in this action, and suggests that the Court "make a final determination of that which it has implicitly recognized, i.e., that there is no just reason for delay." *Reply Memorandum of Westway Metals Corp. in Support of Proposed Final Judgment*, file dated December 7, 1990, at 2. Westway first argues that its claims against all others in this action, against Suisse Gold (Counts II, III, IV), Golden Door and Credin (Counts III and IV), and against Lawrence Systems (Counts V, VI, and VIII) are "separate and independent" from Count I against Lloyds. It proceeds to show, count-by-count, how all of the relief requested by Westway has in one way or another been addressed or disposed of by the October 11 Order. For example, as against Suisse Gold, the Court has already found Suisse Gold legally liable to Westway under the terms of its consignment agreement. *See* Order, 748 F.Supp.

at 1542. Westway also points out that since it is entitled to only one recovery in this action, its claims against Lawrence were effectively mooted by its being granted recovery from Defendant Lloyds.[5]

Intervenor Leach & Garner is in fundamental agreement with Westway that all of *its* desired relief has been accommodated. As between Lloyds and Leach & Garner, "[t]here are no unresolved claims or parties and, hence, Rule 54(b) has no applicability to Leach & Garner." *Memorandum of Leach & Garner Co. in Response to Lloyds' Memorandum in Opposition to Entry of Final Judgments*, file dated December 6, 1990.

The Court finds, as a practical matter, that the relief sought by each intervenor is fundamentally complete. Intervenor Leach & Garner's two-count complaint named only Lloyds and Wright as defendants, and there is no claim by either that the relief requested by Leach & Garner is any less than complete. The relief sought by Westway is fundamentally complete as well, for reasons best described above. The Court also considers it relevant that intervenor Westway could, at any time, move for summary judgment against Suisse Gold, Golden Door, or Credin, as those parties have never answered Westway's Amended Intervenor Complaint.

Lloyds' final argument is that since Stern Metals and Capital Bank's judgment was granted *without prejudice*, relief is not yet complete. Taken alone, this argument is colorable. Taken in the context of the Court's Order Denying Leave to File Amended Claim, file dated November 1, 1990, it is not. In that Order, the Court made clear that the "without prejudice" language was intended to convey as follows:

> The Court rendered its ruling "without prejudice," meaning without adjudication as to the merits or validity of the underlying judgment lien held by intervenor Capital Bank, however it might later be

---

**5.** This ruling in no way impinges upon Lloyds' ability to bring a subsequent subrogation action—but for purposes of this litigation, Westway's relief is complete. *See* Policy, Para. 16 (providing for right of action by insurer Lloyds against "any individual, firm or corporation for loss of or damage to the property insured hereunder"). *See also Frank Briscoe Co. v. Georgia Sprinkler Co.*, 713 F.2d 1500, 1502 (11th Cir. 1983).

collected or asserted. The Court did not intend, as seems to be Capital Bank's reading, that it be given an opportunity to amend its claim to recover in the present action.

Order Denying Leave to File Amended Claim, file dated November 1, 1990, at 2. Hence the October 11 Order was case dispositive as to all claims involving either Stern or Capital Bank.

Westway also suggests that since it can only recover once—its relief seems, at least in the practical sense, to be complete. While the Court believes this view to be both fundamentally and pragmatically correct, it is nonetheless prepared to find, as required by Fed.R.Civ.P. 54(b), that there is no just reason for delay of entry of judgment, and is prepared to expressly direct the Clerk of the Court to enter said judgment as set forth below. *See, e.g., Reeves v. Beardall*, 316 U.S. 283, 62 S.Ct. 1085, 86 L.Ed. 1478 (1942); *Sears Roebuck & Co. v. Mackey*, 351 U.S. 427, 76 S.Ct. 895, 100 L.Ed. 1297 (1956).

### E. AMOUNT NOW CLAIMED BY WESTWAY, AND WHETHER THE COURT'S PRIOR ORDER CAN BE CORRECTED UNDER FED.R.CIV.P. 60(a)

In addition to their objections as to the Court's conclusions and its means of achieving same, Defendants oppose the amounts claimed in the final judgments submitted by intervenors as to both principal and interest. There are four parts to Defendants' arguments that intervenors do not have their figures correct: (1) that intervenors have not established the sum owed as a matter of law; (2) that the "other insurance" provision applies to reduce any recovery; (3) that intervenors' figures for prejudgment interest are erroneous; and (4) that interest should be calculated as simple and not compound under the controlling Florida statute. The respective amounts claimed by each plaintiff/intervenor will be addressed separately.

In its Proposed Final Judgment, file dated November 1, 1990, intervenor Westway requests judgment in the amount of $11,839,307.95, plus interest at a rate of $3,582.60 per day from October 31 through the date of final entry of the Order, and requests that the Court reserve jurisdiction to tax costs and award fees. That amount is in part premised upon the award contained in the Court's Order of October 11, which recited as follows:

> 2. Following from Paragraph 1 above, intervenor WESTWAY METALS CORPORATION's Motion for Summary Judgment be, and the same is hereby GRANTED as to Count I of intervenor Westway's Amended Complaint. Summary Judgment is hereby entered in favor of Westway and against Lloyds in the amount of *$4,979,852.67*, plus interest at the legal rate accruing from February 10, 1983. Counsel for intervenor Westway shall prepare and submit a proposed final judgment in accordance herewith together with costs to be taxed by the Clerk of this Court upon the filing of an appropriate bill of cost form.

Order, 748 F.Supp. at 1547, para. 2.

Westway has since requested that it be permitted to change, pursuant to Fed.R.Civ.P. 60(a), the award of *$4,979,852.67* plus interest to *$4,929,287.16* plus interest to accurately reflect the appropriate amount of judgment. *See* Westway's Notice of Compliance with Order Directing Westway to Submit Final Judgment Including Motion to Correct Clerical Mistake under Rule 60(a), file dated November 1, 1990. The first figure, the higher of the two, was contained in Westway's 10(J)(2) Statement of Material Facts as to which There is No Genuine Issue to be Tried (DE 557). The second and lower figure is the one finding more adequate support in the record. It is the figure contained in Westway's Amended Intervenor Complaint (DE 536), and it is a figure identical to the amount of loss quoted at deposition by Alain Farhi, Westway's former vice-president and treasurer. *See* Deposition of Alain Farhi, at 65 (DE 711). As Westway seeks by its request to ultimately decrease the amount sought, and finding no objection from Defendants, Westway's request

shall be granted and said amount of $4,929,287.16 shall be used in the computation of the final amount owing to Westway.

Defendants also note that the parties have failed to take into account a $1000 deductible endorsement in their final calculations. This was admitted by counsel for intervenors at oral argument. Hence Defendants' request to reduce the amount of judgment accordingly shall be granted, and the $1000 deduction will be effectuated and that amount deducted in final calculation of the amounts of each respective final judgment.

With the exception of the above revision requested by intervenor Westway, both intervenors insist that the amounts quoted in the Court's October 11 Order be used in the calculation of intervenors' respective final judgments, as these amounts were taken from intervenors' respective 10.J.2 statements and, under the Local Rules, all material facts contained in these statements are deemed admitted unless controverted by the opposing parties. S.D.Fla.Gen.R. 10.-J.2. Because this request is identical in substance to that made by intervenor Leach & Garner, these arguments will be addressed simultaneously in the section to follow.

Likewise, and as against the sum claimed by intervenor Westway, Defendants put forth somewhat vague assertions that not all of the gold entrusted to Suisse Gold by Westway was contemplated within the scope of the consignment agreements, and hence a portion should not be covered by these policies. *See* Lloyds' Reply Memorandum in Support of its Motion for Reconsideration and/or Motion to Alter or Amend Judgment, file dated December 3, 1990, at 12–13. The Court will proceed to address this argument in detail as it pertains to the claims of intervenor Leach & Garner, as there this argument is set forth with a great deal more specificity. *See infra* § G., at 27. The reasoning invoked by the Court in rejecting those arguments is likewise generalizable to the arguments set forth by Defendants against the claims of intervenor Westway, and the same are incorporated here as set forth fully, to

serve as additional grounds by which Defendants' objections to the amount at issue are now denied.

F. AMOUNT CLAIMED BY LEACH & GARNER, AND WHETHER ITS (UNCONTROVERTED) 10.J.2 STATEMENT SHOULD BE DISPOSITIVE

In its Proposed Final Judgment, file dated November 2, 1990, intervenor Leach & Garner requests judgment in the amount of $6,394,208.30, plus interest at a rate of $1,934.32 per day from October 31 through the date of final entry of the Order, and requests that the Court reserve jurisdiction to tax costs and award fees. That amount is likewise premised upon the base figure included in its 10.J.2 statement, in the amount of $2,661,418.82. *See* Leach & Garner Company's Statement of the Material Facts as to which there is No Genuine Issue to be Tried Pursuant to Local Rule 10(J)(2) (DE 551, Exhibit A). The Court adopted this figure in its Order of October 11, stating:

3. That intervenor LEACH & GARNER COMPANY's Motion for Summary Judgment be, and the same is hereby GRANTED as to Count I of its Intervenor Complaint. Summary Judgment is hereby entered in favor of Leach & Garner and against Peter Frederick Wright in the amount of *$2,661,418.82* plus interest at the legal rate accruing from February 10, 1983. Counsel for intervenor Leach & Garner shall prepare and submit a proposed final judgment in accordance herewith together with costs to be taxed by the Clerk of this Court upon the filing of an appropriate bill of cost form.

Order, 748 F.Supp. at 1547, para. 3.

Like Westway, Leach & Garner asks that this amount be used in its final judgment, as under the Local Rules, all material facts contained in the 10.J.2 statement are deemed admitted unless controverted by the opposing parties' statement. Defendants assert, as they did against similar arguments proffered by Westway, that contrary to intervenors' position, Leach & Garner's 10.J.2 statements should *not* be

taken as accurate reflections of the amount of goods covered by the policies. Rather, because of poor record keeping (which provided the basis for entry of summary judgment on Lloyds' affirmative defenses numbers IV and VII *against* the plaintiff corporations), the amount of the loss is still a matter of disputed fact.

Local Rule 10.J.2 requires that motions for summary judgment be accompanied, *inter alia,* by:

a concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.

The Rule continues:

The papers opposing a motion for summary judgment shall include ... a concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. *All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the opposing party's statement.*

S.D.Fla.Gen.R. 10.J.2 (emphasis added).

■ While the Court does not believe that the amount contained in Westway's 10.J.2 statement should be taken at face value by the mere fact of its appearance there alone, it is persuaded that this amount went uncontroverted when it initially appeared. By operation of the pertinent local rule, then, said amount is now deemed admitted. Defendants Lloyds and Wright have provided the Court with no reasonable alternative than to so find. When the issue was raised in Westway's 10.J.2 statement, the stated figure went uncontroverted, despite the filing of numerous documents both in support of and in opposition to these filings. *See, e.g.,* Lloyds' Response to Westway's Rule 10(J)(2) Statement (DE 599). Defendants, while contesting the underlying amount of Westway gold at issue, are unable to establish *any* alternative amount, as required *not only* by operation of the local rule, but as part and parcel of the burden placed upon it, as non-moving party, under *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Neither have

the Defendants presented to the Court any statement of the *means by which* such an alternative amount of loss might be established. Thus Defendants have entirely failed to dispel the burden placed upon them by Westway's Motion for Summary Judgment (DE 554), its 10.J.2 Statement (DE 557), Fed.R.Civ.P. 56, and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In addition, and as is the case with intervenor Westway, the parties have failed to take into account a $1000 deductible endorsement in their final calculations. Hence Defendants' request to reduce the amount of judgment accordingly shall be granted, and the $1000 deduction will be effectuated and that amount deducted in final calculation of the amounts of each respective final judgment.

Finally, Defendants claim that the pre-interest figure quoted by Leach & Garner is not an accurate representation of the gold which, according to the Court's theory, should fall under the ambit of coverage following from liability under the consignment agreements. This matter is addressed in the section to follow.

### G. SO–CALLED "UNRELATED" CHARGES FOR FABRICATION, ETC.... ARE THEY COVERED BY THE POLICIES? BY THE CONSIGNMENT AGREEMENTS?

■ Defendants next call into question the pre-interest base figure used by Leach & Garner. Defendants attempt to point out that not all of the gold held on the premises was held pursuant to the consignment agreements. Indeed, argue Defendants, it should follow from the Court's ruling that insurer Lloyds only be responsible for gold consigned to Golden Door pursuant to the applicable consignment agreement, and *not* any additional amount reflecting Golden Door's indebtedness to Leach & Garner for unpaid settlements, fabrication charges, and/or security for other indebtedness.

While Defendants argue in retrospect that coverage for gold held as security for other indebtedness should not be forthcom-

ing, the policy itself provides otherwise. The insurance policies issued by Defendants, by their own terms, cover:

Property as above described, delivered or entrusted to the Assured ... to the Assured by others who are dealers in such property or otherwise engaged in the jewellery trade, but only to the extent of the Assured's own actual interest therein because of money actually advanced thereon, or legal liability for loss or damage thereto.

Policy para. 3 (DE 1, attachment). The legal liability of the assureds to the intervenors is established by and pursuant to the consignment agreements executed between those parties. It follows that these insurance policies cover the respective obligations to intervenors arising from operation of these consignment agreements.

Both intervenors, Westway and Leach & Garner, held, pursuant to their respective consignment agreements, security interests in the goods entrusted to plaintiff corporations, whether these goods were intended for consignment sale, or whether they were being held to secure prior debt. The Security agreement executed by Westway and Suisse Gold provides, *inter alia,*

18. Security Interest:

Consignee hereby agrees to execute a financing statement in respect of the materials and the proceeds arising from the sale thereof, appoints Westway its attorney-in-fact for the execution of such financing statement, and consents to the making of appropriate filings under the Uniform Commercial Code ...

Westway's Consignment Agreement, para. 18 (DE 554, Exhibit D). Likewise, the consignment letter executed between Leach & Garner and Golden Door holds:

7. SELLER'S SECURITY INTEREST

A. As collateral security for the payment of the material and all other obligations of the Buyer to the Seller now existing or hereafter arising, the Buyer grants the Seller a security interest in the following property of the buyer, wherever located, whether such property is now owned or existing or is hereafter acquired or arising and any and all additions, accessions, proceeds and products thereof (the "Security"), all tangible and intangible personal property and fixtures including money, gold, silver, and other precious metals, inventory, machinery and equipment, fixtures, accounts, contract rights, documents, chattel paper, instruments, and general intangibles.

B. The Security shall be stored at the principal place of business of Buyer, unless otherwise consented to by the Seller which consent shall not be unreasonably withheld.

C. Buyer may use, consume, and sell inventory not represented by warehouse receipts, in carrying on the ordinary course of business of the Buyer.

Leach & Garner's Consignment Agreement, para. 7 (DE 551, Exhibit D). Further, both Westway's and Leach & Garner's Security interests were perfected subsequent to entry of the consignment agreements. *See, e.g.,* deposition of Alain Farhi, at 45–48 (DE 711) (describing filing and perfection of security interest in Westway's subject property). The assureds' "legal liability" under the consignment agreements encompasses a great deal more than the gold held on consignment for public sale. Rather, plaintiff corporations' obligations under the respective security agreements run much deeper, and include those which used the gold so held to secure additional obligations.

H. THE "OTHER INSURANCE" CLAUSE ... DOES IT RENDER THIS POLICY AS MERELY SECONDARY COVERAGE FOR LEACH & GARNER?

The "other insurance" clause contained in paragraph 11 of the policy reads as follows:

11. It is understood and agreed that any insurance granted herein shall not cover (excepting as to the legal liability of the Assured) when there is any other insurance which would attach if this policy had not been issued, whether such insurance be in the name of the insured or of any third party. It is,

however, understood and agreed that, if under the terms of such other insurance (in the absence of this policy) the liability would be for a lesser amount than would have been recoverable under this Policy (in the absence of such other policy), then this Policy attaches on the difference.

Policy para. 11 (DE 1, attachment).

Defendants point out first that the "loss" claimed by Leach & Garner is in fact no loss at all, since Leach & Garner were fully insured by the Insurance Company of North America. In fact, Defendants assert, Leach & Garner brought the present suit as a subrogation action for the benefit of that insurance company. It should follow, argues Lloyds, that the so-called "other insurance" provision, set forth above, should operate to limit Leach & Garner's recovery from Lloyds under the terms of the jeweler's block policies.

The intervenors strenuously disagree. Westway first points out in response that by its own plain wording, coverage for *legal liability* of the assured is expressly exempted from operation of the "other insurance" clause. Westway further points out that there is absolutely nothing to indicate that it, Westway, had any other coverage, so the clause is in any case inapplicable to it. Leach & Garner join in noting that since this is an action involving the legal liability of the insured, the "other insurance" clause does not apply.

Indeed, on this point the Court is in agreement with both intervenors and the prevailing case law. The jeweler's block policy becomes the primary coverage where the legal liability of the insured is concerned. This is a well-established proposition running through many of the jeweler's block cases. *See, e.g., Jeweler's Mutual Insurance Co. v. Balogh,* 272 F.2d 889 (5th Cir.1959); *Home Ins. Co. v. Balfour–Guthrie Ins. Co.,* 13 Ariz.App. 327, 330, 476 P.2d 533, 536 (1970). On this point, the language of the policy seems plain enough. The "other insurance" clause is inapplicable in cases where, as here, the "legal liability of the Assured" provides the basis for coverage under the policy.

## I. THE DATE FROM WHICH PRE-JUDGMENT INTEREST IS AWARDED

■ Westway suggests, in support of its claim for $11,839,307.95, that Florida Law governs the award of pre-judgment interest, and under the pertinent Florida Law, *Lloyds U.S. Corp. v. Smallwood,* 719 F.Supp. 1540, 1550 (M.D.Fla.1989), pre-judgment interest should run from the date of the loss until the date the actual judgment is entered. Federal law, however, argues Westway, should be invoked to determine the *rate* of pre-judgment interest. Westway goes on, citing many case authorities, to explain how this hybrid produced the almost $12 million set forth in its proposed final judgment.

Defendants insist that the Court would be mistaken in granting recovery for intervenors *from the date of the robbery,* but should rather grant recovery *from the date of Lloyds' failure to pay on the policy—* an event which occurred, says Defendants, some 30 days after the robbery. Arguing from law contained in *Travelers Indemnity Co. v. Duffy's Little Tavern, Inc.,* 541 So.2d 689, 691 (Fla. 5th DCA 1989), Defendants conclude that the sum owing does not begin to accrue with the date of the robbery, but rather at the time the proceeds of the policy would normally be due under its specific terms. This date, argue Defendants, is somewhat uncertain, since proceeds were to come due under the policy some 30 days after Lloyds received a proper proof of loss statement, although, as Lloyds alleges in one of its affirmative defenses, there is some question as to whether plaintiff corporations filed such proper proof of loss.

Defendants' position would lie on more solid ground if intervenors were in fact recovering in the shoes of plaintiff corporations. In such a case, a breach of the policy as to plaintiff corporations would in turn constitute a breach as to intervenors, and damages would be due from the date of said breach. The theory of recovery set forth in the Court's Order of October 11, however, and expounded upon herein, is

squarely predicated upon intervenors being permitted a direct right of recovery under the policy. Taken in this light, questions of whether plaintiff corporations have properly fulfilled the prerequisites to *its* recovery under the policies, and, if so, when plaintiff corporations might then have recovered, has nothing whatsoever to do with similar questions regarding intervenors' rights. The duties and obligations owed by Lloyds to plaintiff corporations and to intervenors are entirely separate and distinct.

The Court deems it appropriate, then, to award to intervenors pre-judgment interest from the date of their actual loss, *Lloyds U.S. Corp. v. Smallwood,* 719 F.Supp. 1540 (M.D.Fla.1989), *i.e.,* from the date of the reported theft, February 10, 1983.

## J. "SIMPLE" VS. "COMPOUND" INTEREST ... HOW TO CONSTRUE § 687.01, FLA. STAT.

 The figures contained in the respective intervenors' proposed final judgments, as submitted, assumed that the Court would award pre-judgment interest compounded annually. Here Defendants assert in opposition that while the statutory rate of interest in Florida is applicable at 12% per year, Fla.Stat. § 687.01, there is outstanding the question of whether said interest is to be calculated as simple interest per year or whether it should be calculated to compound annually. The Florida Statute provides, in its entirety:

> **687.01. Rate of interest in absence of contract**
>
> In all cases where interest shall accrue without a special contract for the rate thereof, the rate shall be 12 percent per annum, but parties may contract for a lessor or greater rate by contract in writing.

Fla.Stat. § 687.01 (1989).

Defendants' position is that the current state of Florida law prohibits compound interest, except where provided by statute. Therefore, and contrary to the calculations provided in intervenors' proposed final judgments, the interest should not be compounded. *See* Defendant, Lloyds' Memorandum in Opposition to Entry of Final Judgments, file dated November 15, 1990, at 14–19. Intervenors disagree. Intervenors essentially argue that since the pertinent statute, Fla.Stat. § 687.01, mentions interest at a rate of "12 percent per annum," and since later sections, including § 687.03(1) mentions "18 percent *per annum simple interest,*" (emphasis added), then the Legislature must have intended that the former statute provide for compound interest, since the Legislature likewise would have written "simple" had they meant it.

One might just as easily argue, contrary to the view held by intervenors, that all of Chapter 687 should be read *in pari materia,* and that absent clear evidence to the contrary, the whole section should be read in terms pertaining to simple interest. In fact, this interpretation seems more likely: Since § 687.01 has remained essentially unchanged for a number of years—yet § 687.03(1) was last revised in 1979—the latter can be said to clarify the language of the former. If the legislature had intended to alter the earlier statute, it is likely that it would have stated so in a more direct fashion.

The Court will proceed to effectuate what it perceives to be the intent of the Florida Legislature, and award *simple interest* at the statutory rate of 12% per annum, in accordance with Fla.Stat. § 687.01—that is, the principal plus 12% thereof, per annum simple interest, commencing from the date on which plaintiff corporations became liable to the intervenors for the gold consigned to it, extending for each of the years since the obligation has been forthcoming. Based on the foregoing, it is

ORDERED AND ADJUDGED as follows:

1. Leach & Garner's Proposed Final Judgment, file dated November 2, 1990, is MODIFIED in accordance with the above, and SHALL be ENTERED in favor of Leach & Garner and against Defendants Lloyds and Wright in the principal sum of *$2,661,418.82, less $1000,* plus interest at 12% per annum *simple interest* from the date of *February 10, 1983.* Intervenor

Leach & Garner SHALL, within 5 days hereafter, submit a final judgment, computed in accord with this Order and with the Court's Order of October 11, 1990 as hereby modified, and thereupon same shall be entered. This Court finds no further reason to stay entry of judgment, and same shall issue forthwith upon receipt.

2. Westway's Proposed Final Judgment, file dated November 1, 1990, is MODIFIED in accordance with the above, and SHALL be ENTERED in favor of Westway and against Defendants Lloyds and Wright in the principal sum of *$4,929,-287.16, less $1000*, plus interest at 12% per annum *simple interest* from the date of *February 10, 1983*. Intervenor Westway SHALL, within 5 days hereafter, submit a final judgment, computed in accord with this Order and with the Court's Order of October 11, 1990 as hereby modified, and thereupon same shall be entered. This Court finds no further reason to stay entry of judgment, and same shall issue forthwith upon receipt.

3. Defendants' Motion for Reconsideration, file dated October 25, 1990, is hereby DENIED, except to the extent that the Court's Order of October 11, 1990, is modified herein.

4. Defendants Lloyds and Wright's Motion to Stay Entry of, Execution of, or Enforcement of Judgment Pursuant to Federal Rule of Civil Procedure 62(b), file dated November 5, 1990, is hereby DENIED.

5. Westway's Motion to Correct Clerical Error, as contained in its Notice of Compliance with Order Directing Westway to Submit Final Judgment Including Motion to Correct Clerical Mistake under Rule 60(a), file dated November 1, 1990, is hereby GRANTED, altering said amount requested by Westway from $4,979,852.67 plus interest to $4,929,287.16 plus interest to accurately reflect the appropriate amount of judgment.

6. Westway's Motion for Leave to Re-File deposition Transcript of Alain Farhi, file dated November 2, 1990, is hereby GRANTED. Said deposition shall stand as filed.

7. Westway's Motion for Attorney's Fees, file dated November 13, 1990; Motion of Leach & Garner Company for Attorney's Fees and Costs, file dated November 13, 1990; and Westway's Bill of Costs, file dated November 13, 1990; as well as all matters related thereto, are currently under consideration by the Special Master by virtue of the Court's Order of Reference dated January 29, 1991. The Court shall await receipt of the Special Master's Reports and Recommendations before acting thereupon, and hereby reserves jurisdiction accordingly.

8. The Memorandum Opinion of the Special Master, file dated August 16, 1990, which addressed the alleged excess payments to witnesses and recommended that Defendants' pleadings not be accordingly stricken is hereby RATIFIED, AFFIRMED and APPROVED in its entirety, and adopted as the opinion of the Court. Objections thereto are duly noted, and OVERRULED. The underlying issues are rendered moot by the terms of the ruling contained herein and in the Court's Order of October 11, 1990.[6]

9. Any and all motions pending and outstanding and not otherwise addressed by this Order and the Court's Order of October 11 be, and the same are hereby DENIED.

DONE AND ORDERED.

---

**6.** The nature, type, and extent of the payments made to witnesses, however, without prior permission of the Court, is so disturbing as might constitute a separate and independent basis for striking the pleadings of Lloyds were the matter not otherwise addressed on the merits as a matter of law. *See* Special Master's Memorandum Opinion and Recommendation on Evidentiary Hearing of June 5, 6, 7, 13 and 14, 1990, dated August 16, 1990 (DE 777).